RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 07a0299p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

  *Plaintiff-Appellee,*

  *v.*

No. 03-2152

NICHOLAS A. GARCIA,

  *Defendant-Appellant.*

>

Appeal from the United States District Court
for the Eastern District of Michigan at Bay City.
No. 92-20103—David M. Lawson, District Judge.

Argued: September 20, 2006

Decided and Filed: August 8, 2007

Before: BATCHELDER and MOORE, Circuit Judges; HOOD, District Judge.[*]

———————————

## COUNSEL

**ARGUED:** David C. Thomas, CHICAGO-KENT COLLEGE OF LAW, Chicago, Illinois, for Appellant. Janet L. Parker, ASSISTANT UNITED STATES ATTORNEY, Bay City, Michigan, for Appellee. **ON BRIEF:** David C. Thomas, CHICAGO-KENT COLLEGE OF LAW, Chicago, Illinois, for Appellant. Janet L. Parker, ASSISTANT UNITED STATES ATTORNEY, Bay City, Michigan, for Appellee.

  BATCHELDER, J., delivered the opinion of the court, in which HOOD, D. J., joined. MOORE, J. (pp. 15-17), delivered a separate concurring opinion.

———————————

## OPINION

———————————

  ALICE M. BATCHELDER, Circuit Judge. Defendant Nicholas Garcia ("Garcia") was indicted on one count of conspiring to possess with intent to distribute 1,000 kilograms or more of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 846. The jury found Garcia guilty of this charge, and the district court sentenced him to 360 months' imprisonment. On appeal Garcia contends that (1) the district court erred in denying the motion to suppress evidence found on his person and in the vehicle in which he was riding; (2) the district court erred in denying the motion

———————

  [*]The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

to suppress evidence discovered during a search of his residence; (3) a prior Sixth Circuit panel erred in upholding the timeliness of the fourth superseding indictment issued against him; and (4) his case should be remanded for re-sentencing in light of *United States v. Booker*, 543 U.S. 220 (2005).[1] We find no err in the district court's admission of evidence found on Garcia's person and in the vehicle in which he was riding, and conclude that the district court committed harmless error in admitting some of the evidence discovered during the search of his residence. Furthermore, we apply the law of the case doctrine in refusing to address the timeliness of the fourth superseding indictment. We therefore **AFFIRM** Garcia's conviction, but because we conclude that his sentencing violated *Booker*, we **VACATE** his sentence and **REMAND** for further proceedings.

## I. Factual and Procedural Background

Garcia and at least eight other individuals were involved in a sweeping and large-scale plan to transport and distribute mass quantities of marijuana. The marijuana was imported from Mexico into Texas, and the co-conspirators planned to transport a large shipment to Birch Run, Michigan, in late November 1992. On November 23, 1992, one of the co-conspirators, Alex Ovalle, and an unknown companion traveled to Michigan in search of a location to unload their marijuana. The two men stayed at the Sheraton Inn in Saginaw, Michigan, located approximately 20 miles from Birch Run. Soon after arriving, they purchased a 1986 GMC Suburban to facilitate their local travel. The Sheraton's front office manager, Marcia Becker, grew suspicious of their activities and informed local law enforcement officer, Michael Berent, of her concerns. After a few days, Ovalle and his companion left Michigan and returned to Texas.

On November 30, 1992, Ovalle and Ben Canales returned to the Sheraton in Saginaw. Becker notified the police of Ovalle's return, and a team of officers responded by assembling in the room next to Ovalle's, listening through cracks in the adjoining doors, monitoring individuals entering the room, and reviewing phone records. The officers heard the men refer to nine-millimeters, money counters, kilos, thousands of dollars, "something arriving tomorrow," and the need to "break it down." The officers followed — or at least attempted to follow — Ovalle and Canales as they traveled in the Suburban, met with random individuals around town, and shopped at industrial supply stores. The officers eventually overheard the men complain that "they would have to find a different motel because too many people were asking too many questions." On December 2, 1992, Ovalle and Canales checked out of the Sheraton.

On that same morning, Defendant Nicholas Garcia and Cruz Rodriguez arrived at the airport in Bay City, Michigan. Rodriguez phoned the Sheraton and requested a ride from the airport to the motel, claiming that his boss, Alex Ovalle, was staying there. Becker authorized the courtesy van to transport Rodriguez and Garcia to the Sheraton and informed Officer Berent of their request for a ride. Despite his having checked out earlier that morning, Ovalle returned to the Sheraton to pick up Garcia and Rodriguez. In the meantime, Officer Berent had contacted Chief Assistant Prosecutor Howard Gave who informed him that the police had sufficient evidence to stop the Suburban for "investigative purposes." When the courtesy van arrived at the Sheraton, Garcia and Rodriguez exited the van, transferred their luggage to the Suburban driven by Ovalle, and drove away quickly.

Shortly thereafter the officers executed a "felony stop" of the Suburban. After the Suburban pulled to the side of the road, numerous police officers exited their vehicles with their weapons drawn. Via public address system, the officers demanded that Ovalle throw the keys onto the pavement. The five occupants — Ovalle, Canales, Rodriguez, Garcia, and Orville Dale Irwin — were instructed to exit the vehicle, walk backwards towards the officers, and get down on their

---

[1]We note that Garcia filed a pro se brief raising a number of additional arguments. After wading through these contentions and giving them careful consideration, we conclude that none of these claims is meritorious and decline to address them in detail in this opinion.

knees. The officers approached the occupants, frisked them, handcuffed them, and took them to police vehicles. The pat down of Garcia resulted in the seizure of his pager, which was admitted as evidence at trial, and the officers' preliminary questioning of Irwin revealed that the men were now staying at the Super 8 Motel in Birch Run. The five men were then transported to the Michigan State Police station where they were detained for five hours until their formal arrest later that evening.

Within half an hour of the stop of the Suburban, the officers performed a canine narcotics sniff on the vehicle, returning two positive "hits." The officers included the results of the canine sniff in the affidavit supporting the warrant to search the Suburban. About two hours later, the officers executed the search warrant on the Suburban, seizing miscellaneous papers, luggage, briefcases, power tools, a high-capacity scale, and more than $25,000 in cash. At trial the government introduced Garcia's luggage tag and two bundles of $5,000 in green plastic wrap that were found in his bags. The officers later executed a search warrant on a tractor-trailer parked at the Super 8 Hotel in Birch Run, discovering a fiberglass tank containing over 3,000 pounds of marijuana hidden behind a "false wall" in the trailer.

Meanwhile in Texas, Officer Callaway Fowler of the San Antonio Police Department was involved in a separate drug investigation of Garcia and his wife Susana. Approximately two weeks after Garcia's arrest in Michigan, Officer Fowler received an anonymous phone call alleging that cocaine was stored at the Garcias' San Antonio residence. The next day — on the basis of the anonymous tip and evidence acquired during his investigation — Officer Fowler obtained a state warrant to search for cocaine at Susana Garcia's home. The warrant authorized a search for cocaine and an arrest of Susana Garcia and "any other parties found on [the] premises or making their escape therefrom." The warrant specified only cocaine — it did not mention documents or drug paraphernalia or otherwise mention Nicholas Garcia. Because Officer Fowler had been sharing information with the Drug Enforcement Agency ("DEA") for several months, he notified the DEA task force in San Antonio of the warrant, and Agent Michael Belton expressed an interest in accompanying Officer Fowler during the search.

Later that day the search was executed by Officer Fowler, DEA Agent Belton, DEA Agent Ron Bennett, IRS Agent Larry Zunker, and other San Antonio officers. During an hour of searching, the officers discovered small amounts of cocaine and marijuana residue and seized hundreds of documents. In particular Officer Fowler seized crumbled pieces of notebook paper displaying various mathematical calculations, which were found in the bottom of a foot locker emitting a strong marijuana odor, and containing marijuana residue, zigzag papers, scales, and green plastic shrink wrap. The officers also seized a number of documents from the file cabinet located in the master bedroom. These documents included receipts and other financial records showing the vast discrepancy between the Garcias' reported income and their yearly expenditures. The officers also seized two invoices containing co-conspirator Irwin's name and a map of San Antonio on which an area of the city notorious for drug activity was circled in red. At trial the government introduced approximately twenty documents — including those mentioned above — seized during this search.

Garcia and eight others were originally indicted for a drug distribution conspiracy alleged to have begun in November 1992. A few months later the grand jury returned a superseding indictment that extended the beginning of the conspiracy to September 1992. Garcia pled not guilty, went to trial, and was convicted by a jury. On appeal, a panel of this Court reversed Garcia's conviction, holding that the jurors who convicted him were selected through a plan that violated the Fifth Amendment Equal Protection Clause. *See United States v. Ovalle*, 136 F.3d 1092, 1107 (6th Cir. 1998).

In May 1998, the grand jury returned a second superseding indictment, which restated the charges in the first superseding indictment. A week later the court issued a third superceding

indictment, which included possession with intent to distribute heroin and cocaine in addition to marijuana. In 2000, the district court dismissed the third superseding indictment, concluding that the statute of limitations had run and the indictment did not "relate back" because it materially broadened the charges against Garcia. Soon thereafter the grand jury returned a fourth superseding indictment, which was identical to the second superseding indictment except that, in response to the Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), it alleged that the conspiracy involved "1,000 kilograms or more of marijuana." The district court held that the fourth superseding indictment was time-barred because, similar to the third superseding indictment, it impermissibly expanded the charges against Garcia. In 2001, a panel of this Court reversed and reinstated the fourth superseding indictment, finding that the indictment was not time-barred because it did not materially broaden the charges against Garcia. *See United States v. Garcia*, 268 F.3d 407, 415-16 (6th Cir. 2001).

The government proceeded with its prosecution under the fourth superseding indictment. In August 2002, Garcia filed a motion to suppress the fruits of an unlawful arrest and a motion to suppress evidence discovered during the search of his residence. The district court denied the former and partially granted the latter. In May 2003, Garcia was tried and convicted on one count of conspiracy to possess with intent to distribute more than 1,000 kilograms of marijuana. The district court sentenced him to 360 months' imprisonment. Garcia filed a timely notice of appeal.

## II.

### A. Garcia's Motion to Suppress the Fruits of an Unlawful Arrest[2]

"When reviewing a motion to suppress, [we] must consider evidence in the light most likely to support the district court's decision[.]" *United States v. Marxen*, 410 F.3d 326, 328 (6th Cir. 2005) (internal quotation omitted). "[A] district court's factual findings are accepted unless they are clearly erroneous; however, the district court's application of the law to the facts, such as a finding of probable cause, is reviewed de novo." *United States v. Pasquarille*, 20 F.3d 682, 685 (6th Cir. 1994) (citing *United States v. Thomas*, 11 F.3d 620, 627 (6th Cir. 1993)).

After stopping the Suburban for investigatory purposes, the officers seized Garcia's pager during a patdown of his person. Thereafter the officers executed a canine narcotics sniff on the Suburban, and, based in part on the positive "hits" from the canine sniff, a judge issued a warrant to search the Suburban. In executing the search warrant, the officers seized Garcia's luggage, which contained his luggage tag and two bundles of $5,000. Garcia argues that the district court should have suppressed (1) the luggage tag and two bundles of currency, each in the amount of $5,000, seized from the Suburban and (2) the pager seized from his person. The district court refused to suppress the luggage tag and bundles of cash, finding that they were not the fruit of his arrest. The district court also determined that Garcia's pager was properly seized pursuant to a *Terry* patdown. *See Terry v. Ohio*, 392 U.S. 1, 27 (1968) ("permit[ting] a reasonable search for weapons for the protection of the police officer"). We affirm the district court's refusal to suppress this evidence, although we do so for reasons different from those relied on by the district court.

---

[2] Garcia referred to this as a "Motion to Quash Arrest," which the district court properly construed as a motion to suppress evidence.

### 1.  Evidence Seized from the Suburban[3]

The officers seized Garcia's luggage tag and bundles of money pursuant to a properly executed search warrant for the Suburban.  Therefore, in order to suppress this evidence, Garcia must show that the warrant was obtained as a result of a prior illegality.  *See Wong Sun v. United States*, 371 U.S. 471, 485 (1963) (noting that the exclusionary rule bars evidence "obtained either during or as a direct result of an unlawful invasion").  Garcia contends that his arrest during the stop of the Suburban is the prior illegality that tainted the subsequent search warrant for the Suburban.  According to Garcia's argument, because the illegal arrest allowed the officers to execute a canine narcotics sniff and because the results of the canine sniff were included in the supporting affidavit, the search warrant is a fruit of his illegal arrest and is thus invalid.  Garcia's argument erroneously equates the investigatory stop of the Suburban with his allegedly illegal arrest.  Even assuming he was illegally arrested at the time the Suburban was stopped, it was the investigatory stop — and not the illegal arrest — that produced the canine narcotics sniff and the resulting search warrant.  So long as the officers acted properly in stopping the vehicle and executing the canine sniff, the resulting search warrant was not tainted by a prior illegality.  The Supreme Court has recently recognized that a passenger of a stopped vehicle, like Garcia, "is seized within the meaning of the Fourth Amendment" and "so may challenge the constitutionality of the stop."  *Brendlin v. California*, No. 06-8120, 2007 WL 1730143, at *2, 2007 U.S. LEXIS 7897, at *6 (S. Ct. June 18, 2007).

We conclude that the stop of the Suburban was lawful.  An officer may conduct an investigatory stop if it is supported by a "reasonable suspicion" of criminal activity.  *Smoak v. Hall*, 460 F.3d 768, 778 (6th Cir. 2006) (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).  "Reasonable suspicion" requires the officer to have "'a particularized and objective basis for suspecting the particular person . . . of criminal activity' based on 'specific and articulable facts[.]'"  *Id.* at 778-79 (quoting *Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 813-14 (6th Cir. 1999)).  Garcia does not challenge the stop of the Suburban for investigatory purposes, and we find that the officers indeed had reasonable suspicion to support the stop.  The officers had been monitoring, following, and listening to Ovalle — the driver of the Suburban — for at least two days.  During this time they had heard Ovalle and his companions discuss guns, kilos, and large sums of money.  They also knew that Ovalle had left the Sheraton after complaining of "too many people asking too many questions" and that he had later returned to transport two individuals who claimed to work for him.  These "specific and articulable facts" provided "reasonable suspicion" for an investigatory stop of the Suburban.

We turn next to whether the canine narcotics sniff exceeded the permissible scope or duration of the investigatory stop.  "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop."  *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)).  The scope of activities conducted during an investigatory stop "must reasonably be related to the circumstances that initially justified the stop."  *United States v. Richardson*, 949 F.2d 851, 856 (6th Cir. 1991).  The

---

[3]To the extent that Garcia may be challenging the admission of items belonging to other occupants of the Suburban — something that is not clear from his brief — he lacks standing to do so.  "[A] defendant has standing to challenge the admission of evidence only if the defendant's own constitutional rights have been violated."  *United States v. Davis*, 430 F.3d 345, 359-60 (6th Cir. 2005).  In the Fourth Amendment context, standing is established if the defendant has a "legitimate expectation of privacy" in the places searched or the items seized.  *United States v. King*, 55 F.3d 1193, 1195 (6th Cir. 1995).  Garcia did not own the Suburban, but was merely a passenger in it, and thus he lacked a legitimate expectation of privacy in the area searched.  Moreover, Garcia lacked a legitimate expectation of privacy in the seized items that belonged to other occupants of the Suburban.  *See Davis*, 430 F.3d at 360 (holding that the defendant lacked standing to bring a Fourth Amendment claim deriving from the search of a vehicle belonging to another because the defendant had no reasonable expectation of privacy in the vehicle or in the items seized therefrom).  Garcia thus lacked standing to challenge the admissibility of items belonging to other occupants of the Suburban.

officers reasonably suspected the Suburban's occupants of illegal drug trafficking, and the canine narcotics sniff is directly related to investigating this suspicion. Moreover, the duration of the stop was reasonable; the canine sniff was performed within a half hour of the stop, and we have previously upheld an investigatory stop that included a thirty-five minute wait for the canine unit. *See United States v. Orsolini*, 300 F.3d 724, 730 (6th Cir. 2002) (finding a *Terry* detention reasonable where the entire investigation lasted less than one hour with approximately thirty-five minutes spent waiting for the canine unit to arrive). Thus the canine narcotics sniff was lawfully conducted as part of the investigatory stop.

Garcia provides no evidence that his allegedly illegal arrest contributed to or in any way tainted the search warrant for the Suburban. Consequently, we need not determine the precise timing of Garcia's arrest or whether it was supported by probable cause. Because we find that the officers did not act unlawfully in stopping the Suburban or executing a canine narcotics sniff, and because Garcia has failed to show that the search warrant was the fruit of a prior illegality, we affirm the district court's refusal to suppress the evidence seized from the Suburban.

### 2. Pager Seized from Garcia's Person

The officers seized Garcia's pager during a patdown of his person following the stop of the Suburban. The district court determined that the pager was legally seized pursuant to a *Terry* frisk for weapons. *See Terry*, 392 U.S. at 25-26 (authorizing a "strictly circumscribed" search for weapons in the absence of probable cause to arrest). Garcia argues that *Terry* does not justify the seizure of his pager because *Terry* permits only the seizure of items that reasonably appear to be weapons, not other evidence of crime. We agree with Garcia that the district court erred in concluding that *Terry* and its progeny authorize the seizure of his pager, but because we conclude that the pager would inevitably have been lawfully discovered, we affirm the district court's refusal to suppress the pager.

If a police officer "reasonably believes or suspects" that the defendant is armed, he may conduct a patdown for weapons in the interest of his own safety. *Ybarra v. Illinois*, 444 U.S. 85, 93 (1979). The *Terry* doctrine permits only a search for weapons, not for evidence in general. *See id.* at 93-94 ("Nothing in *Terry* can be understood to allow . . . any search whatever for anything but weapons."); *United States v. Strahan*, 984 F.2d 155, 158 (6th Cir. 1993) ("*Terry* allows only an examination for concealed objects and forbids searching for anything other than weapons."). Upon stopping the Suburban, the officers reasonably suspected the occupants of drug trafficking because they had overheard them discussing kilos, guns, and large quantities of money. The officers also knew that the recently arrived occupants — Garcia and Rodriguez — claimed to work for Ovalle, a suspected drug dealer. Based on this and other information, the officers reasonably suspected that Garcia was armed, and they acted properly in conducting a patdown for weapons.

Seizure of items during a patdown is warranted if "the officer reasonably believe[s] that the [concealed item] could be a weapon." *Id.* Moreover, under the plain feel doctrine, an officer may seize an "object whose contour or mass" makes its identity as contraband "immediately apparent." *Minnesota v. Dickerson*, 508 U.S. 366, 375-76 (1993); *see also United States v. Walker*, 181 F.3d 774, 778 (6th Cir. 1999) (holding that "police officers may seize nonthreatening contraband detected during a protective patdown search . . . so long as the officers' search stays within the bounds marked by *Terry*"). The government did not elicit testimony from the seizing officer claiming that he mistook the pager for a weapon, and even assuming that the officer knew that the concealed object was a pager, it is clear that a pager is not contraband. We conclude that the district court erred in finding the seizure of the pager justified under *Terry*.

We nonetheless affirm the admissibility of the pager because it would inevitably have been lawfully discovered and, in any event, the district court's denial of the motion to suppress the pager

was harmless error. *See Nix v. Williams*, 467 U.S. 431, 443 n.4 (1984) (noting that "the inevitable discovery exception to the exclusionary rule is closely related in purpose to the harmless-error rule"). The Fourth Amendment does not contain a provision that prohibits "the use of evidence obtained in violation of its commands." *Arizona v. Evans*, 514 U.S. 1, 10 (1995) (citing *United States v. Leon*, 468 U.S. 897, 906 (1984)). But the judicially crafted exclusionary rule mandates suppression of evidence obtained from a constitutional violation. *Id.* at 10-11. *See Mapp v. Ohio*, 367 U.S. 643, 657 (1961) (declaring that the exclusionary rule is essential in applying constitutional principles). The inevitable discovery doctrine is an exception to the exclusionary rule which "allows unlawfully obtained evidence to be admitted at trial if the government can [show] . . . that the evidence inevitably would have been acquired through lawful means." *United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995); *see also Nix*, 467 U.S. at 444. The doctrine applies whenever there are "compelling facts establishing that the disputed evidence inevitably would have been discovered." *Kennedy*, 61 F.3d at 499. More specifically, the doctrine applies where the facts indicate that the officers inevitably would have discovered and seized the tainted evidence by following "routine procedures." *United States v. Vite-Espinoza*, 342 F.3d 462, 466 (6th Cir. 2003). Had the police not seized Garcia's pager during the protective patdown, they inevitably would have seized it from his person during his subsequent arrest. After the search of the Suburban disclosed two bundles of cash in Garcia's luggage, the officers had probable cause to arrest him. As a part of this lawful arrest, the officers would have followed the "routine procedure" of searching Garcia prior to taking him into custody. *See Gustafson v. Florida*, 414 U.S. 260, 266 (1973) (holding that an officer who arrests a suspect and takes him into custody is "entitled to make a full search of [his] person incident to that lawful arrest"). The officers would have seized his pager during this search as evidence of his involvement in drug trafficking. The pager thus inevitably would have been seized from Garcia, and its introduction into evidence did not violate the exclusionary rule.

Alternatively, even if we assume that the inevitable discovery doctrine does not apply and the district court erred in admitting the pager, we find that its admission was harmless. Some errors, when viewed in light of the particular facts, are "so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless." *Chapman v. California*, 386 U.S. 18, 22 (1967); *see also* FED. R. CRIM. P. 52(a) ("Any error . . . that does not affect substantial rights must be disregarded."). "[B]efore a federal constitutional error can be held harmless, the [reviewing] court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman*, 386 U.S. at 24. The harmless error doctrine has been applied to a variety of constitutional errors, including the admission of evidence obtained in violation of the Fourth Amendment. *See Rose v. Clark*, 478 U.S. 570, 576-77 (1986). The government did not introduce phone records from the pager at trial, and in fact used the pager merely to argue that Garcia was probably involved in drug trafficking because drug dealers are notorious for using pagers. In light of the other evidence supporting Garcia's conviction, we find that the government's use of the pager at trial did not contribute to the verdict and that its admission — assuming it was erroneous — was harmless beyond a reasonable doubt.

### B. Garcia's Motion to Suppress the Evidence Seized at His Residence

Officers from the San Antonio police department obtained a state warrant authorizing the search of Garcia's residence for cocaine and nothing more. The San Antonio officers, accompanied by members of the DEA task force, nevertheless seized over a hundred documents from his residence. Garcia contends that (1) the officers engaged in an invalid "general search" by flagrantly disregarding the limits of the search warrant, and (2) the seizure of these documents was not within the plain view doctrine exception to the warrant requirement. We agree with Garcia's second argument and conclude that the seizure of these documents cannot be justified by the plain view doctrine; we nevertheless find that, in light of the overwhelming evidence against Garcia at trial, the admission of these documents was harmless error.

### 1. General Search in Violation of the Fourth Amendment

Garcia first argues that the officers engaged in an unlawful "general search" of his residence in violation of the Fourth Amendment. The phrase "general search" embodies a specific Fourth Amendment term of art, accompanied by particular rules, policies, and remedies. A search pursuant to a valid warrant may devolve into an invalid general search if the officers "flagrant[ly] disregard . . . the limitations of [the] search warrant." *United States v. Lambert*, 771 F.2d 83, 93 (6th Cir. 1985). For purposes of general search analysis, we will find that an officer flagrantly disregards the limitations of a warrant only where he "exceed[s] the scope of the warrant *in the places searched*" (rather than the items seized). *See Waller v. Georgia*, 467 U.S. 39, 43 n.3 (1984) (emphasis added); *see also United States v. Decker*, 956 F.2d 773, 779 (8th Cir. 1992) ("The flagrant disregard standard applies only where the government exceeds the scope of the authorized search in terms of the places searched, and not to cases in which the government indulges in excessive seizures."). The test for determining if the officers engaged in an impermissible general search is whether their search *unreasonably* exceeded the scope of the warrant. *Brindley v. Best*, 192 F.3d 525, 531 (6th Cir. 1999).

"The prohibition against general searches . . . serves primarily as a protection against unjustified intrusions on privacy," *Horton v. California*, 496 U.S. 128, 141 (1990), and the broad remedy for such a sweeping Fourth Amendment violation is "the suppression of *all* evidence seized during the search," *Lambert*, 771 F.2d at 93 (emphasis added); *see also United States v. Uzenski*, 434 F.3d 690, 706 (4th Cir. 2006) (stating that "blanket suppression" is an "extraordinary remedy" only to be used when the officers' violations of the warrant's limitations are "extreme"). In contrast, the prohibition against the unlawful seizure of a particular item during an otherwise valid search does not invade the defendant's privacy interest but merely "deprives [him] of dominion over his . . . property," *Horton*, 496 U.S. at 133, and the narrow remedy for such a concrete Fourth Amendment violation is the suppression of only the unlawfully seized evidence, *see Waller*, 467 U.S. at 43 n.3; *Decker*, 956 F.2d at 779. Thus, where the officers unlawfully seize certain items but do not flagrantly disregard the limits of the warrant by unreasonably searching places not authorized in the warrant, the court must suppress the unlawfully seized items, but "there is certainly no requirement that lawfully seized evidence be suppressed as well." *Waller*, 467 U.S. at 43 n.3.

The search warrant for Garcia's residence authorized the officers to peruse every area of the house — including "all garages, outhouses, edifices, structures, openings, and enclosures, thereto" — in search of an item that can be hidden in small and discrete places (i.e., cocaine). Garcia does not argue that the officers searched places not authorized in the warrant; instead he contends that the officers' seizure of more than one hundred documents exhibited their "flagrant disregard" for the terms of the warrant. Because Garcia couches his argument as a challenge to the extent of the officers' seizure, rather than the scope of their search, we find that his "general search" argument lacks merit. *See Waller*, 467 U.S. at 43 n.3. In any event, given that the warrant authorized the officers to look anywhere on Garcia's property for a small, easy-to-conceal item, it would be extremely difficult for Garcia to establish that the officers searched in places not authorized by this particular warrant. We conclude that the officers' search of Garcia's residence did not exceed the scope of the warrant — much less unreasonably so — and hold that the officers' search did not amount to an impermissible "general search" of Garcia's residence.

### 2. The Plain View Doctrine

Unless an exception applies, a warrant is generally required to permit law enforcement officers to search a place or seize an item. *United States v. McLevain*, 310 F.3d 434, 438 (6th Cir. 2002). The warrant in this case did not authorize the search for or seizure of documents or drug paraphernalia, and the officers therefore cannot rely on the warrant to authorize their seizure of the documents. The district court meticulously reviewed each of the proffered documents, finding that

most of them were lawfully seized pursuant to the "plain view" exception to the warrant requirement, but rejecting some that were not. Garcia argues that the district court erred because none of the documents seized from his residence were encompassed by the plain view doctrine. We commend the district court's painstaking and conscientious attempt to resolve this issue, but we agree with Garcia that the documents seized from his residence did not come within the plain view doctrine, and the district court erred in admitting them.

The law recognizes the plain view doctrine as an exception to the warrant requirement. *See Horton*, 496 U.S. at 134. "It is well established that under certain circumstances the police may seize evidence in plain view without a warrant." *Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971). Four factors must be satisfied in order for the plain view doctrine to apply: (1) the object must be in plain view; (2) the officer must be legally present in the place from which the object can be plainly seen; (3) the object's incriminating nature must be immediately apparent; and (4) the officer must have a right of access to the object. *Horton*, 496 U.S. at 136-37; *McLevain*, 310 F.3d at 438-39. Garcia contends that the second and third factors were not satisfied when the officers seized the documents from his residence. We will address each of these factors in turn.

### a. Second Factor - The Officers Must be Legally Present

Officer Fowler of the San Antonio Police Department obtained a state warrant to search Garcia's residence. Pursuant to Officer Fowler's invitation, three members of the DEA task force accompanied the San Antonio officers in executing the search. Garcia argues that the federal agents improperly "tagged along" with the local officers in executing the state search warrant, and thus their presence at the search was unlawful. Garcia specifically contends that this case is controlled by our decision in *United States v. Sanchez*, 509 F.2d 886, 889-90 (6th Cir. 1975). We read *Sanchez* differently and find it inapplicable to the facts before us.

In *Sanchez*, a local police officer with a warrant to search for narcotics learned that there were explosives at the residence. The local officer contacted an Alcohol, Tobacco, and Firearms ("ATF") agent to assist in the search, but the ATF agent did not obtain a separate warrant to search for explosives. The court held that the ATF agent was not legally present at the scene of the search, reasoning that the narcotics warrant "could not be used to validate the entrance of a federal officer having both probable cause and the opportunity to obtain a separate warrant to search for different items of property." *Id.* at 889. This holding suggests that a federal agent may not assist in the execution of a state search warrant where: (1) the federal officer had probable cause to obtain a separate warrant; (2) the federal officer had an opportunity but failed to obtain a separate warrant; and (3) the federal officer was searching for items different from those authorized by the state search warrant.

Subsequent Sixth Circuit tag-along cases confirm our reading of *Sanchez*. Some of these cases emphasize the first two conditions — that a federal officer must have probable cause and an opportunity to obtain a separate search warrant. In *United States v. Hare*, 589 F.2d 1291, 1297 (6th Cir. 1979), while further construing the *Sanchez* decision, we noted that "[t]he *existence of probable cause* before the search transformed the legitimate participation of trained officers . . . into an inexcusable attempt to evade the warrant requirement." *Id.* (emphasis added). Later, in *United States v. Bonds*, 12 F.3d 540, 571 (6th Cir. 1993), we cited *Sanchez* for the proposition that "a federal agent may 'tag along' on a state search without tainting evidence of federal crimes uncovered in the process if he has no *probable cause* to search which would allow him to obtain a separate federal warrant." *Id.* (emphasis added); *see also McLevain*, 310 F.3d at 440.

Other cases confirm the third condition — that the federal officers must be searching for items different from those authorized by the state search warrant. For instance in *United States v. Ford*, 184 F.3d 566, 578-79 (6th Cir. 1999), we acknowledged that "*Sanchez* does not prohibit

federal officers from being present during execution of a state warrant, . . . but only prevents officers from using *a warrant describing one kind of evidence as a pretext for searching for evidence outside the warrant*." *Id.* (emphasis added). Similarly, the *Sanchez* decision itself emphasized the third condition by distinguishing the Eighth Circuit's decision in *United States v. Carwell*, 491 F.2d 1334 (8th Cir. 1974), on the basis that "*Carwell* did not involve a simultaneous *search for different articles* by local and federal authorities." *Sanchez*, 509 F.2d at 890 (emphasis added). In light of our circuit's precedent, we conclude that evidence of a federal crime seized by a federal officer assisting in a search pursuant to a state warrant will be tainted only if all three *Sanchez* conditions are present.

The DEA agents' assistance during the search of Garcia's residence was not unlawful because the third *Sanchez* condition was not present: the DEA agents were searching for drugs, the same evidence authorized in the state search warrant. Garcia contends that the third condition is satisfied because the federal agents not only sought narcotics but also hoped to discover documents to assist in the federal prosecution. This argument is insufficient to bring this case within the purview of *Sanchez*. Even if the DEA agents were interested in finding documents, they were ultimately searching for drugs in order to bring federal drug-trafficking charges against Garcia. This circumstance, in which DEA agents joined state officers to search for drugs and drug-related evidence pursuant to a state warrant to search for drugs, contrasts starkly with the *Sanchez* case, in which an ATF agent explicitly looking for explosives assisted state officers in executing a warrant to search for narcotics. Because the DEA agents sought drugs and drug-related documents pursuant to a state search warrant for cocaine, we find that the federal agents were legally present during the search of Garcia's residence.

### b. Third Factor - The Incriminating Nature must be Immediately Apparent

The seizure of an item in plain view "is legitimate only where it is immediately apparent to the police that they have evidence before them." *Horton*, 496 U.S. at 136 (quoting *Coolidge*, 403 U.S. at 466). Even though the officers in this case were authorized to search only for cocaine, they took over a hundred documents from Garcia's house, claiming that the plain view doctrine permitted their seizure. At trial Officer Fowler testified that it was necessary to look through Garcia's papers and envelopes to ensure that they did not contain small packets of cocaine, but he acknowledged that it was unnecessary to read the documents in executing the search for cocaine. Agent Belton, however, expressly testified that he read and reviewed every document that he thought might contribute to his federal investigation of Garcia.

The precise issue we must address here is whether a document, even though in plain view, is within the plain view exception if it must be read in order for its incriminating nature to be determined. We hold that it is not.

The "immediately apparent" requirement is a vital constraint on the plain view doctrine exception to the Fourth Amendment warrant requirement. The Fourth Amendment requires that warrants must "particularly describ[e] . . . [the] things to be seized." U.S. CONST. AMEND. IV. Requiring particular descriptions in search warrants prevents police officers from engaging in general exploratory searches — an evil experienced and abhorred by our nation's founders. *Coolidge*, 403 U.S. at 467. Because the plain view doctrine supplants the need for a particularized warrant, the "immediately apparent" requirement is necessary to prevent officers from using the plain view doctrine as a means to extend a particularized search authorized by Fourth Amendment principles into an unlawful exploratory search. *See Horton*, 496 U.S. at 136-37; *Arizona v. Hicks*, 480 U.S. 321, 334 (1987) (O'Connor, J., dissenting) ("The purpose of the immediately apparent requirement is to prevent general, exploratory rummaging in a person's belongings.") (internal quotations omitted). An overbroad reading of the immediately apparent requirement subverts and jeopardizes fundamental Fourth Amendment principles.

In *McLevain*, 310 F.3d at 441, we said that in determining whether an object's incriminating nature is "immediately apparent," we look to three factors, none of which is necessary but each of which is instructive: (1) "a nexus between the seized object and the items particularized in the search warrant"; (2) "whether the 'intrinsic nature' or appearance of the seized object gives probable cause to believe that it is associated with criminal activity"; and (3) whether "the executing officers can *at the time* of discovery of the object on the facts then available to them determine probable cause of the object's incriminating nature." *Id.* (quoting *United States v. Beal*, 810 F.2d 574, 576-77 (6th Cir. 1987)). In addition to these three factors, we have specifically held that an object's incriminating nature is not immediately apparent if it "appears suspicious to an officer but further investigation is required to establish probable cause as to its association with criminal activity[.]" *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 555 (6th Cir. 2003) (quoting *McLevain*, 310 F.3d at 443). Moreover, the officer must recognize the incriminating nature of an object as a result of his "immediate" or "instantaneous sensory perception." *See United States v. McLernon*, 746 F.2d 1098, 1125 (6th Cir. 1984) (requiring that the officer's "'immediate' sensory perception . . . must produce probable cause of crime"); *Beal*, 810 F.2d at 577 (stating that "to be immediate, probable cause must be the direct result of the officer's instantaneous sensory perception of the object") (internal quotation omitted).

We conclude that the criminal nature of most of the documents seized by Officer Fowler and Agent Belton was not immediately apparent. Neither the intrinsic nature nor the appearance of most of the documents gave the officers probable cause to believe that they were associated with criminal activity. Further, the officers did not, as a result of their "instantaneous sensory perception," recognize the incriminating nature of most of those documents. Receipts, financial records, and invoices, in and of themselves, are lawful and innocuous items, and the testimony of Officer Fowler and Agent Belton made it clear that in order to establish an association between these documents and any criminal activity, they had to undertake "further investigation." Agent Belton expressly admitted that he read and reviewed every document that he thought might assist in Garcia's prosecution. These documents therefore did not come within the scope of the plain view exception to the warrant requirement.

We also conclude that the district court should have suppressed the map of San Antonio seized from Garcia's house. This map displayed a notorious drug area of the city circled in red, but to determine the significance of the circled area, the officers would have been required to inspect the map and read the various street names. The officers thus "required far more than an instant" to connect the map to Garcia's involvement in criminal activity. *See Shamaeizadeh*, 338 F.3d at 555 (finding that the plain view doctrine is not satisfied where "the officers would have required far more than an instant to conclude that any of the documents implicated criminal activity"). Like the financial documents, the map was innocuous without close inspection, and its criminal nature was therefore not immediately apparent. We hold that the financial records, invoices, receipts, and map seized from Garcia's residence did not come within the plain view exception, and the district court erred in admitting them into evidence.

We find the "immediately apparent" question to be much closer when examining the notebook paper seized from the footlocker in Garcia's garage. The notebook paper displayed scribbled mathematical calculations and was located in the bottom of a footlocker that smelled strongly of marijuana and contained marijuana residue. The officers did not exceed the scope of the warrant by opening the footlocker because it was a place in which cocaine easily could have been stored. A searching officer — by merely glancing at, without reading, these papers — could have instantaneously discerned their incriminating nature because they contained only a few obvious, scribbled calculations arranged in ledger format and were found in a footlocker reeking of marijuana. In the present case, however, the district court found that Officer Fowler "examined" these papers prior to learning of their criminal connection. Because the officer in this case admitted

that he closely examined — and presumably read — these papers in order to determine their incriminating nature, we find that the district court erred in admitting this evidence.

Overall, this case is analogous to — and thus our decision is supported by — the Supreme Court's decision in *Arizona v. Hicks*, 480 U.S. 321 (1987). The officer in *Hicks* was searching for a suspect in an apartment when he discovered obviously expensive stereo equipment which seemed out of place in the poorly furnished apartment. Prior to moving the stereo equipment to expose its serial numbers, the officer had only a reasonable suspicion that the equipment was stolen, and therefore evidence of a crime. *Id.* at 326. The Court found that reasonable suspicion was insufficient to invoke the plain view doctrine, *see id.*, and also concluded that the officer's moving of the equipment constituted a further search unsupported by a warrant or an exception to the warrant requirement. *Id.* at 324-35. Accordingly, the Court ruled that the search for the serial numbers and the seizure of the stereo equipment was unreasonable and in violation of the Fourth Amendment. *Id.* at 326. Similarly, the officers in the instant case, upon initial inspection of most of the documents, lacked probable cause to connect them to Garcia's criminal activity. It was not until the officers picked up and closely reviewed the documents that they learned of their value in Garcia's prosecution. This close inspection of the documents constituted a further search unsupported by probable cause and thus violated the Fourth Amendment.[4]

Garcia also objects to the admission of non-document evidence — including marijuana residue, zigzag papers, scales, and green plastic shrink wrap — seized from the footlocker in his garage. We readily conclude that the incriminating nature of these items — all intrinsically related to drug-trafficking activity, and all found in the bottom of the footlocker that discernibly had been used in connection with marijuana — was immediately evident to the searching officers. The district court thus did not err in admitting these items.

Even though we have concluded that the district court erred in admitting the financial records, invoices, receipts, map, and notebook paper seized from Garcia's residence, we find that this error was harmless. *See Chapman*, 386 U.S. at 22; FED. R. CRIM. P. 52(a). A federal constitutional error is harmless only where the reviewing court finds that it was "harmless beyond a reasonable doubt." *Chapman*, 386 U.S. at 24.

Garcia contends that he was prejudiced by the admission of two invoices displaying the name of co-conspirator Irwin because these invoices were the only evidence connecting him to Irwin. Garcia's argument wholly mischaracterizes the evidence at trial; in fact the properly admitted exhibits and trial transcript provide a wealth of evidence connecting Garcia and Irwin for purposes of this conspiracy. First, and most importantly, it is undisputed that both Garcia and Irwin were in the Suburban at the time it was stopped by the police; that Ovalle and Canales were also in the Suburban at that point; that Irwin, Ovalle, and Canales were all by that time staying at the Super 8 Motel at Birch Run, where the tractor-trailer filled with marijuana was parked; and that Garcia and Irwin were both arrested shortly after the police stopped the Suburban. These facts establish an incontrovertible connection between these two men for purposes of the conspiracy and completely undermine Garcia's assertion of prejudice. Second, Irwin himself testified that Garcia sought his participation in the conspiracy by propositioning him to transport and unload trailers of marijuana. Irwin also testified that on numerous occasions Garcia told him to transport money and narcotics,

----

[4]Notably, the majority in *Hicks* rejected Justice O'Connor's argument that the officer's moving and inspection of the equipment should have been upheld because "it was a 'cursory inspection' rather than a 'full-blown search.'" *Hicks*, 480 U.S. at 328. *See id.* at 335 (O'Connor, J., dissenting). The majority declined to complicate Fourth Amendment jurisprudence by creating an additional category of police probing that was "neither a 'plain view' inspection nor yet a 'full-blown search.'" *Id.* at 328-29. We therefore cannot justify the officers' review of the documents here by characterizing it as a cursory inspection that may be used to establish probable cause and satisfy the plain view doctrine.

recounting at least one occasion where Garcia instructed him to transport over 200 pounds of marijuana and a briefcase containing nearly $500,000. Third, another co-conspirator, Rickey Nombrano, testified that Garcia and Irwin were jointly associated with a trucking company known as Cheetah Transportation. Nombrano also testified that Garcia first introduced him to Irwin, and he recounted an incident where he witnessed Garcia and Irwin counting money together. In light of this abundant evidence and more connecting Irwin and Garcia, we find that the district court's error in admitting Irwin's two invoices was harmless beyond a reasonable doubt.

Garcia also believes that he was prejudiced by the admission of the financial documents and receipts seized from his house because those documents showed that he lived beyond the bounds of his reported income and suggested that he had a supplemental income from drug trafficking. While proof of Garcia's large expenditures raises an inference that he was involved in drug trafficking, it is undoubtedly a small and inconsequential piece of the evidence against him. The remaining evidence showed, among other things, that (1) Garcia was intimately involved in the Chapa drug cartel which transported large quantities of narcotics from Mexico to the United States; (2) Garcia traveled to Michigan in December 1992 with two bundles of $5,000 packaged in green shrink wrap; (3) Garcia had a longstanding drug-trafficking relationship with Irwin — the man who admittedly drove the tractor-trailer with over 1,000 pounds of marijuana to Michigan; and (4) Garcia was stopped and later arrested while traveling in the Suburban with Irwin, who had recently arrived with the tractor-trailer full of marijuana. In light of the abundant evidence on these issues, we conclude that the erroneous admission of the financial records seized from Garcia's residence was harmless beyond a reasonable doubt. *See United States v. Baro*, 15 F.3d 563, 568 (6th Cir. 1994) (finding that the district court's admission of tainted evidence was harmless error because there was "extensive testimony at trial supporting [the defendant's] guilt on the counts of conviction").

### C.  Timeliness of Garcia's Fourth Superseding Indictment

In 2000, the district court dismissed Garcia's fourth superseding indictment, concluding that it impermissibly expanded the original indictment and was thus time-barred. In 2001, a panel of this Court reversed the district court, holding that the fourth superseding indictment did not materially broaden the charges already pending against Garcia and on that basis concluding that the fourth superseding indictment "related back" to the timely filing of the second superseding indictment. *See Garcia*, 268 F.3d at 416. Garcia was thereafter tried and convicted on the charges in the fourth superseding indictment. Garcia now attempts to challenge the conclusion we reached over five years ago when we affirmed the timeliness of the fourth superseding indictment.

The law-of-the-case doctrine expresses the routine practice of courts "to refuse to reopen what has been decided." *United States v. Todd*, 920 F.2d 399, 403 (6th Cir. 1990) (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988)). That doctrine, however, does not limit a court's power to hear a dispute. *Id.* Put differently, "[a] court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule courts should be loathe to do so in the absence of extraordinary circumstances." *Id.* Because there are no "extraordinary circumstances" warranting reconsideration of this issue, we rely upon the law-of-the-case doctrine and decline to reevaluate our prior decision affirming the timeliness of Garcia's fourth superseding indictment.

### D.  Re-sentencing in light of *Booker*

The jury found Garcia guilty of conspiracy to possess with intent to distribute more than 1,000 kilograms of marijuana. The jury's verdict, combined with Garcia's prior drug conviction, yielded a statutory range of 20 years to life. *See* 21 U.S.C. § 841(b)(1)(A). At the sentencing hearing the district court found by a preponderance of the evidence that Garcia's trafficking in cocaine was relevant conduct for purposes of this conspiracy and included various quantities of

cocaine when calculating the base offense level of 38. The district court next determined that Garcia was a manager or supervisor of the conspiracy and imposed a three-level adjustment for his major role in the offense, resulting in an offense level of 41. Given his classification in Criminal History Category IV, the sentencing range was 360 months to life in prison, and the district court imposed a sentence of 360 months' imprisonment, the lowest sentence in that range.

In *United States v. Booker*, 543 U.S. 220, 243-44 (2005), the Supreme Court held that the mandatory federal sentencing guidelines violated the Sixth Amendment by requiring judges to enhance the sentences of defendants based on facts not found by a jury or admitted by the defendant. To remedy this problem, the Court excised from the Sentencing Act the provisions making the guidelines mandatory. *Id.* at 245. *Booker*'s holding is to be applied to all cases on direct review according to ordinary prudential doctrines, such as plain error review, to determine if re-sentencing is warranted. *Id.* at 268.

Garcia was sentenced in violation of the Sixth Amendment because, pursuant to the mandatory federal sentencing guidelines in place at the time, the district court enhanced his offense level based on the court's findings by a preponderance of the evidence that (1) his trafficking in cocaine was part of the relevant conduct involved in this conspiracy, *see* U.S.S.G. § 1B1.3 (2001); and (2) he played a supervisory role in the criminal enterprise, *see* U.S.S.G. § 3B1.1(b) (2001). Because Garcia failed to make a Sixth Amendment objection at sentencing, we conduct plain error review to determine if he must be re-sentenced. *See United States v. Sanders*, 404 F.3d 980, 987-88 (6th Cir. 2005) (applying plain error review because the defendant raised his *Booker* challenge for the first time on appeal). Under that test, there must be (1) error, (2) that is plain, (3) and that affects substantial rights. *United States v. Oliver*, 397 F.3d 369, 378 (6th Cir. 2005). Provided that these three conditions are satisfied, an appellate court may then exercise its discretion to notice the forfeited error if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.*

Garcia's sentence in violation of the Sixth Amendment constitutes error that is plain, *see id.* at 378-79; affects Garcia's substantial rights, *see id.* at 379-80; and diminishes the integrity and reputation of the judicial system, *see id.* at 380. Accordingly, we remand to the district court for re-sentencing under the now-advisory sentencing guidelines.

## CONCLUSION

For the foregoing reasons, we affirm the district court's admission of the evidence seized from Garcia's person, the evidence seized from the Suburban in which he was riding, and the marijuana residue, zigzag papers, scales, and green plastic shrink wrap seized from his footlocker. We hold that the district court erred in admitting the financial documents, receipts, invoices, city map, and notebook paper seized from Garcia's residence, but find that this error was harmless beyond a reasonable doubt. We therefore **AFFIRM** Garcia's conviction, but we **VACATE** his sentence and **REMAND** for re-sentencing in light of *Booker*.

---

**CONCURRENCE**

---

KAREN NELSON MOORE, Circuit Judge, concurring.  I write separately to raise the following points with respect to Parts II.B.2.a and II.B.2.b of the majority opinion.

### I.  PART II.B.2.a:  LAWFUL-PRESENCE ANALYSIS

Although I agree that all law enforcement personnel at the Garcia residence were lawfully present at the time of the search, I doubt the continuing viability of any rule based on the reasoning in *United States v. Sanchez*, 509 F.2d 886 (6th Cir. 1975).  At the time that *Sanchez* was decided, the Supreme Court's plurality opinion in *Coolidge v. New Hampshire*, 403 U.S. 443, 468 (1971), stated that if law enforcement personnel found items that were not named in the warrant and that were not found "inadvertently," then they could not seize those items under the plain-view exception to the warrant requirement.  *Id*. at 469.  *Sanchez* relied on *Coolidge* for the proposition that "[w]hen a law enforcement officer has prior knowledge of the existence and location of property which he has probable cause to believe is illegally possessed, as well as ample opportunity to obtain a judicially sanctioned search warrant, the Fourth Amendment mandates that he must follow this procedure."  *Sanchez* 509 F.2d at 890.

In *Horton v. California*, 496 U.S. 128 (1990), the Supreme Court changed tack and held that inadvertence is not a necessary condition for a plain-view seizure.  *Id*. at 130.  As we subsequently recognized in *United States v. Bonds*, 12 F.3d 540 (6th Cir. 1993), in *Horton*, "the Supreme Court . . . eliminated the requirement that seizures in plain view by a 'tag along' officer must be of evidence inadvertently discovered. . . .  [A]ny discovery of incriminating evidence in plain view, whether or not the officer expects to find it in the course of a search, is admissible."  *Id*. at 571 n.29.

It follows that if the federal officer is tagging along to execute the state warrant, and the federal agent stays within the bounds of that warrant in terms of where he or she searches, then he or she is lawfully present at the search regardless of whether he or she has probable cause to search for something else and regardless of what he or she may hope to find while assisting in the search.

This position was set forth by the Ninth Circuit in *United States v. Ewain*, 88 F.3d 689, 695 (9th Cir. 1996).  In *Ewain*, the defendant objected to the fact that the narcotics agents who had obtained a warrant to search his home for drugs invited the postal inspector as a tag-along.  Through the course of the search, the postal inspector found evidence that Ewain was involved in mail theft. In rejecting Ewain's argument the Ninth Circuit explained:

> Now that *Horton* has eliminated the "inadvertent" discovery limitation in the plurality opinion in *Coolidge*, it no longer matters that the invited-along officer was looking for what he found, which thing was not described in the warrant. *What matters is whether the officers looked in places or in ways not permitted by the warrant.*

*Id*. (emphasis supplied).  This approach makes sense.  If the tag-along officer begins looking in places unauthorized by the warrant, then he or she is not lawfully present at that particular place at the time he or she finds the contraband; conversely, if he or she is searching within the bounds of the warrant, then anything he or she finds that otherwise satisfies the plain-view exception is admissible.  As stated by the *Ewain* court:

> If the officers looked only where they were entitled to look under the terms of the warrant, and where they would have looked for the things described in the warrant,

then the privacy of the person whose belongings are searched in those places has already been lost, and another pair of eyes does not add to that loss.

*Id.* (citation omitted).  The tag-along officer's "presence is at most evidence bearing on the probability that the officers looked in places they would not have looked had they been searching only for the things specified in the warrant." *Id.*

Applying this analysis to the facts of this case, the federal agents were lawfully present at the place from which they viewed the items seized at the search.  The warrant was for cocaine, which can be found in the smallest of places.  Further, there was no allegation that the officers searched in places on the Garcia property which were not authorized by the warrant.  In this case, the majority opinion inquires into whether or not the tag-along officer had separate probable cause and whether or not the tag-along officer was looking for items different from those authorized in the warrant.  These questions are no longer relevant after *Horton*.

I realize that post-*Horton* cases in this circuit have continued to rely on *Sanchez* in determining whether or not law enforcement was lawfully present for purposes of the plain-view exception. *United States v. McLevain*, 310 F.3d 434, 440 (6th Cir. 2002); *United States v. Ford*, 184 F.3d 566, 578-79 (6th Cir. 1999); *Bonds*, 12 F.3d 540, 571-72; *Bills v. Aseltine*, 958 F.2d 697, 703 (6th Cir. 1992).  Although we do not overrule *Sanchez* today, the parties are free to seek en banc review.

## II.  PART II.B.2.b:  "INCRIMINATING NATURE IMMEDIATELY APPARENT" ANALYSIS

I agree that all of the documentary items seized at the Garcia residence were subject to suppression, because they did not fall within the purview of the plain-view doctrine.  However, I am concerned with language in the majority opinion suggesting that the documents found in the footlocker containing mathematical calculations would have been admissible had the officer not testified that he "examined" them.  Maj. Op. at 11.  Such a conclusion stands in conflict with our holding that a document is not within "the plain view exception if it must be read in order for its incriminating nature to be determined."  Maj. Op. at 10.

In my view, one could not "instantaneously discern[]" the incriminating nature of mathematical calculations written on a piece of paper.  Maj. Op. at 11.  One would still need to read the document in order to know that there were numbers on the paper and that those numbers expressed mathematical thoughts.  Next the reader would need to think about what those numbers might represent.  Only then would the reader arrive at the conclusion that the document is of an incriminating nature.  Thus, like the documents conveying information through letters, the incriminating nature of documents conveying information through numbers is not immediately apparent.  In my opinion, the fact that Officer Fowler acknowledged that he "examined" these documents is not outcome determinative, but rather, expresses what anyone would have to do in order to ascertain the incriminating nature of such documents.

## III.  PART II.B.2.b:  HARMLESS-ERROR ANALYSIS

Although I agree with the majority's harmless-error analysis, I would emphasize that, had Garcia and Irwin not been in the Suburban together at the drug bust, the harmless-error question would have been a much closer call.  The government pointed to the testimony of Dale Irwin, Oscar Nombrano, and Rickey Nombrano in support of its contention that admission of the Cheetah Transportation invoices was harmless error.  But these witnesses were all involved in the drug conspiracy and received favorable treatment in exchange for their cooperation.  Joint Appendix "J.A.") at 2377-78 (Irwin Test. at 14-15); J.A. at 1922 (Oscar Nombrano Test. at 151); J.A. at 1994,

1998 (Rickey Nombrano Test. at 65, 69).   This arguably undermined the credibility of these witnesses in the minds of the jury.  The fact that Garcia and Irwin were in the Suburban together is strong evidence corroborating their relationship with each other.  Accordingly, I agree that the use of the Cheetah Transportation invoices to establish a linkage between Garcia and Irwin was harmless error.