RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 10a0298p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

      *Plaintiff-Appellee,*

      *v.*

WILLARD HOWARD,

      *Defendant-Appellant.*

No. 08-6143

Appeal from the United States District Court
for the Eastern District of Tennessee of Chattanooga.
No. 06-00005-002—Curtis L. Collier, Chief District Judge.

Argued: July 28, 2010

Decided and Filed: September 14, 2010

Before: GILMAN and COOK, Circuit Judges; OLIVER, Chief District Judge.[*]

_____

## COUNSEL

**ARGUED:** M. Keith Davis, AUSTIN, DAVIS & MITCHELL, Dunlap, Tennessee, for Appellant. Scott A. Winne, ASSISTANT UNITED STATES ATTORNEY, Chattanooga, Tennessee, for Appellee. **ON BRIEF:** M. Keith Davis, AUSTIN, DAVIS & MITCHELL, Dunlap, Tennessee, for Appellant. Scott A. Winne, ASSISTANT UNITED STATES ATTORNEY, Chattanooga, Tennessee, for Appellee.

_____

## OPINION

_____

RONALD LEE GILMAN, Circuit Judge. Willard Howard was found guilty by a jury on one count of conspiring to possess and distribute at least five kilograms of cocaine and on one count of attempting to possess and distribute the drug. The district

---

[*] The Honorable Solomon Oliver, Jr., Chief United States District Judge for the Northern District of Ohio, sitting by designation.

court sentenced Howard to life imprisonment.  Howard appeals his conviction, arguing that the district court erred by (1) failing to authorize funding for Howard to obtain the assistance of a drug-dog expert, (2) refusing to suppress certain evidence, (3) limiting Howard's cross-examination of a government witness, (4) permitting the government to introduce evidence of Howard being previously investigated by law enforcement agents, (5) declining to grant a mistrial when a government witness mentioned that he had previously encountered Howard during another drug investigation, and (6) concluding that Howard's conviction was supported by sufficient evidence.  For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A.     Factual background

This case began on December 12, 2005 with a typical traffic stop along northbound Interstate 75 in Bradley County, Tennessee.  Deputy Shane McKee of the Bradley County Sheriff's Office stopped a Volkswagon Passat driven by Antonio Bautista-Benitez for a minor traffic violation.  Upon further investigation, Deputy McKee discovered that Bautista-Benitez had no driver's license and that the Passat was not registered in his name.

Detectives Eduardo Choate and Joe Renner soon joined Deputy McKee to assist with the traffic stop.  They searched the Passat, with Bautista-Benitez's consent, and discovered a secret compartment underneath the backseat.  Hidden inside were over five kilograms of cocaine.  This discovery caused the officers to arrest Bautista-Benitez and take him, the contraband, and two cell phones found in the Passat back to the Bradley County Sheriff's Office.

Once back at the Sheriff's Office, one of Bautista-Benitez's cell phones began to ring. Detective Choate answered it.  The caller sounded like a male of Hispanic origin. Detective Choate told this man that Choate worked for a wrecker service that had been called to tow the Passat because of a collision.  He gave the caller Detective Renner's

cell phone number, telling the caller that the number belonged to the owner of the wrecker service.

A short time later, a woman named Amy Cornwell called Detective Renner's cell phone. She claimed to be Bautista-Benitez's girlfriend and asked Detective Renner (believing him to be the owner of the wrecker service) about the Passat, indicating that she wanted to come by and pick it up. Over the next couple of days, Cornwell and Detective Renner exchanged phone calls and planned for Cornwell and her stepfather to drive from Crittenden, Kentucky (in the greater Cincinnati area) to Cleveland, Tennessee to retrieve the Passat.

At approximately 7:00 p.m. on December 14, 2005, Detective Renner met Cornwell and her stepfather near the highway and led them to Brewer's Wrecker Service, where the Passat was purportedly being held. Cromwell and her stepfather were driving a Chevrolet Suburban. Once they arrived at Brewer's, Cornwell went inside with Detective Renner while her stepfather remained in the vehicle.

Detective Renner gave Cornwell a "tow bill" in the amount of $326, which she paid in cash. He then told Cornwell that he had found the secret compartment inside the Passat and that he would call the police if she did not give him some of what he had found inside. Cornwell appeared stunned, paused for a second, and then responded that she did not know what he was talking about. Detective Renner then gave the "takedown signal" to the other officers present at Brewer's, after which he took Cornwell into custody.

The other officers approached the Suburban. They identified themselves as police officers and ordered Cornwell's stepfather to get out of the vehicle. He was then patted down by the officers, handcuffed, and taken into a small office inside the Brewer's building. Deputy McKee and Agent Crosby Jones of the U.S. Drug Enforcement Administration (DEA) joined the stepfather in the office to ask him some questions. There they learned that this man, Cornwell's stepfather, was Howard.

Detective Choate left Howard with Deputy McKee and Agent Jones for the purpose of going back outside to search the Suburban. Before Detective Choate started the search, however, his supervisor (Lieutenant Brian Quinn) instructed Choate to retrieve the latter's drug-detection dog, Titan, to first sniff the exterior of the Suburban before doing a search of the vehicle's interior. Detective Choate briefly left the scene to pick up Titan, returned ten minutes later, and walked Titan around the Suburban. Titan "alerted" on the vehicle, meaning that he signaled that there was an odor of narcotics present.

After the alert, Detective Choate went back inside Brewer's to speak with Howard. Agent Jones informed Detective Choate that Howard had been given the *Miranda* warnings. Detective Choate then asked Howard whether there were any drugs, guns, or large amounts of money in the vehicle. Howard responded that there were no drugs or guns in the Suburban, but there was about $100,000 of cash inside. The parties dispute whether Howard told the officers that they could "check" the Suburban, and further dispute whether he was given the *Miranda* warnings. The record is also inconsistent as to whether Detective Choate retrieved Titan before or after Howard admitted that there was cash in the Suburban. In any event, after Howard was questioned and after Titan alerted on the Suburban, officers searched the vehicle. They discovered a shoebox in the back of the Suburban with approximately $95,000 in cash inside.

That same evening, Detective Renner called the Northern Kentucky Drug Strike Force (NKDSF) and spoke with Agent Matthew Dewayne Rolfson. Detective Renner told Agent Rolfson about the circumstances surrounding Howard's arrest, and Agent Rolfson passed this information on to NKDSF Agent Scott Hardcorn. Agent Hardcorn then drove out to a parcel of land owned by Howard in Crittenden, Kentucky. The property appeared to contain two mobile homes accessible by a common driveway that could be locked with a single gate, with a mailbox across the road that bore the address 15712 Carlisle Road (the Carlisle Road property).

After making the trip to Carlisle Road, Agent Hardcorn prepared an affidavit for a warrant to search the property. A search warrant was subsequently issued on December 15, 2005. It described the property as follows:

> **On or in the premises numbered:**
> 15712 Carlisle Road
> Crittenden, KY 41030
> Kenton County
>
> **More particularly described as:** A singlewide trailer, which is white in color with brown trim. The trailer has two entrances, both facing toward Carlisle Road. The front door is facing a brown barn. A brown metal pole barn is attached to the white trailer with several additional wooden structures by the pole barn. A mailbox with the numbers "15712" clearly posted on it is located across the street from the described property. Additionally, there is another single family trailer located approximately 100 yards to the right of the above described pole barn. This trailer is white in color with the front door facing toward Carlisle Road. The roof is dark in color with wooden steps going to the front door. All of the buildings described here are located on the property of 15712 Carlisle Road.

(Bold in original.)

The property was searched on the same day that the search warrant was issued. During the search, the officers discovered digital scales and an electronic money counter inside the second mobile home (the one 100 yards to the right of the pole barn). But as revealed almost a year later, when Howard filed a supplement to his original motion to suppress this evidence, the second mobile home "was actually contained on a separate parcel of property and listed under a different address, that is, 15690 Carlisle Road."

## B.    Procedural background

### 1.    *Pretrial motions*

Both Bautista-Benitez and Howard were jointly charged in the same indictment with offenses relating to the distribution of cocaine. But unlike Howard, Bautista-Benitez eventually pled guilty to conspiring to distribute the drug. The government in

turn dismissed the remaining charge against Bautista-Benitez of possessing cocaine with the intent to distribute.

Howard elected to proceed to trial. But before the trial began, Howard filed a number of motions. Only those relevant to the instant appeal are discussed below.

Two months after this case was opened, Howard filed a motion, pursuant to 18 U.S.C. § 3006A, to authorize funding for him to obtain the assistance of a drug-dog expert in order "to properly challenge the admissibility of evidence with respect to contraband located by 'Titan.'" The magistrate judge denied the motion as moot, relying on the government's representation that it would "not seek to introduce at any trial of [Howard] evidence that a drug-detection dog alerted on Howard's vehicle."

Howard also filed a motion to suppress evidence of the $95,000 in cash discovered during the search of his Suburban, as well as the statements that he made to the law enforcement officers while at Brewer's Wrecker Service. He argued that he had not voluntarily consented to the search of the Suburban and that he had not been given the *Miranda* warnings before he was questioned by the officers. The magistrate judge held an evidentiary hearing on this motion and subsequently issued a report recommending that the motion to suppress be granted. In his report, the magistrate judge found that Howard had been given the *Miranda* warnings before being questioned by the officers at Brewer's, that Howard had admitted that there was approximately $100,000 of cash in the Suburban, and that he had told the officers that they could go "check" the vehicle. But the magistrate judge also concluded that the officers had no more than reasonable suspicion, and less than probable cause, at the point when they arrested and detained Howard on December 14, 2005, so that all statements made by Howard and all evidence seized as a result of his unlawful arrest should be suppressed.

The government objected to the recommendations of the magistrate judge. In its objections, the government argued for the first time that, even if Howard's arrest was unlawful (which it denied), the evidence seized from the Suburban was still admissible under the independent-source doctrine. Specifically, the government contended that

"[t]he probable cause arising out of [Titan's] alert is an independent source justifying the search of the vehicle because it was not causally connected to the alleged illegal arrest."

The district court adopted in part the recommendations of the magistrate judge by granting Howard's motion to suppress the latter's statements to the officers at Brewer's. But as to the cash seized from the Suburban, the court determined that further factual development and argument were needed. The court therefore deferred ruling on that portion of the magistrate judge's recommendations and remanded the matter to the magistrate judge "to take further evidence and make a determination whether Titan's alert was wholly independent from the illegal arrest and whether the evidence seized from the [S]uburban would have been inevitably discovered by lawful means."

Around this time, Howard filed two additional motions, both related to what he claimed was an unlawful search of his Suburban. First, Howard moved the district court to suppress the evidence found in the second mobile home, arguing that the search of the Carlisle Road property was causally linked to, and therefore tainted by, his illegal arrest. The second was a renewed motion for a drug-dog expert. Howard asserted that he needed the expert's assistance to be able to adequately attack the reliability of Titan—an integral part of his argument for suppression.

Regarding the latter motion, the district court denied Howard's request. In a thorough, well-reasoned opinion, the court noted the frequency with which criminal defendants facing drug charges seek authorization for a drug-dog expert. *See United States v. Howard*, 448 F. Supp. 2d 889, 891 (E.D. Tenn. 2006). The court concluded that authorizing funds for such an expert in every case upon request "would be unduly burdensome given the frequency with which dog alerts are used as a basis for probable cause." *Id.* And although the court acknowledged that "[i]t is conceivable the facts surrounding a particular dog alert would warrant the services of an expert," the court concluded that "no such facts have been identified here." *Id.* Accordingly, the court denied Howard's motion. Howard moved for reconsideration, but this too was denied.

Approximately five months after he had filed his motion to suppress the evidence discovered in the second mobile home, Howard supplemented the motion with an

additional basis for suppression. He argued that the search warrant failed to particularly describe the property to be searched because, although the warrant described the property as one parcel, it was legally two separate parcels. Howard also contended that Agent Hardcorn's search-warrant affidavit was insufficient to establish probable cause to search the Carlisle Road property.

While Howard's motion concerning the mobile-home search was pending, the magistrate judge held a second evidentiary hearing on Howard's motion to suppress the search of his Suburban, in accordance with the remand order from the district court. Immediately before the hearing, Howard filed a supplemental memorandum in which he objected to being required to participate without the assistance of a drug-dog expert. Both parties filed additional supplemental memoranda after the hearing to support their respective positions concerning suppression. These issues were still pending when the magistrate judge held a third evidentiary hearing, this time concerning the motion to suppress the evidence found in the second mobile home. At the conclusion of this third hearing, the parties once again filed supplemental memoranda containing additional arguments.

The magistrate judge later entered a detailed Report and Recommendation concerning the searches of both the Suburban and the second mobile home. First, the magistrate judge determined "that the ten-minute detention of [Howard] while Titan was retrieved and deployed lasted no longer than was necessary," and further concluded "that a detention of ten minutes was entirely reasonable because the officers had reasonable articulable suspicion of criminal activity." Titan's deployment was therefore found to be permissible under the investigatory-detention standards set forth in *Terry v. Ohio*, 392 U.S. 1, 30-31 (1968) (allowing a police officer to detain a suspect briefly for investigative purposes where the officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot").

Next, the magistrate judge concluded that Titan's alert provided an independent basis to search Howard's Suburban, and that Titan would have been utilized even if the officers had not first arrested Howard. The independent-source and inevitable-discovery

doctrines thus validated the search. And because Titan was a certified, reliable drug dog, his alert established probable cause to search Howard's Suburban. The magistrate judge thus recommended that the motion to suppress the cash found inside the Suburban be denied.

Finally turning to the validity of the search warrant, the magistrate judge concluded that there was probable cause to search the Carlisle Road property. The magistrate judge further determined that the search warrant sufficiently described the property in question, despite the fact that the second mobile home was technically on a separate parcel with an address different from the one set forth in the search warrant. Accordingly, the magistrate judge recommended that the court deny the motion to suppress the digital scales and the electronic money counter found in the second mobile home.

Despite Howard's failure to timely object to the Report and Recommendation, the district court permitted him to file a belated response. Howard's response challenged the training and reliability of Titan and Titan's handler, Detective Choate. He further argued that Titan's alert was not in fact independent of Howard's unlawful arrest. This rendered the search of the Suburban unlawful, Howard contended, and also meant that the evidence found in the second mobile home was the "poisonous fruit" of the initial unlawful search. And even if this were not the case, Howard asserted that the search warrant failed to particularly describe the property to be searched.

The district court reviewed Howard's objections, but ultimately agreed with the reasoning of the magistrate judge. It thus adopted the magistrate judge's recommendations and denied Howard's motions to suppress. The case then proceeded to trial.

### 2.    *Trial*

Howard was tried on the two counts of the superseding indictment. Count one charged him with conspiracy to possess and distribute at least five kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. And count two charged

him with attempting to possess and distribute the drug, also in violation of the cited statutes.

At trial, Deputy McKee was the first witness for the government. He testified that he pulled Bautista-Benitez over on northbound Interstate 75 for a routine traffic violation. After obtaining Bautista-Benitez's consent to search the car, he discovered cocaine in the Passat that Bautista-Benitez was driving. David Brown, a scientist with the Tennessee Bureau of Investigation, then confirmed that the substance discovered in the Passat was cocaine that weighed over five kilograms.

Bautista-Benitez was the next witness to testify for the government. He explained that he had transported drugs for a man named Martine Lopez in Atlanta to Howard in the greater Cincinnati–northern Kentucky area on two or three occasions. The arrangement was that he would deliver five kilograms of cocaine to Howard and would return to Lopez with $95,000 from Howard in payment for the drugs. During the cross-examination of Bautista-Benitez, Howard's counsel asked if, before pleading guilty, Bautista-Benitez had filed a motion to exclude certain evidence against him. The government objected to this question on the grounds of relevance. Howard's counsel then argued that it went to Bautista-Benitez's credibility. But the district court sustained the government's objection, reasoning that the inference Howard's counsel sought to raise through this question was tantamount to punishing Bautista-Benitez for exercising his constitutional right to challenge the legality of the evidence against him.

The government then called Rodney Eldridge, the Kenton County Clerk, to testify. Eldridge identified a deed that conveyed title to both 15712 Carlisle Road and 15690 Carlisle Road from Christine Howard-Rose (Howard's ex-wife) and Terry Rose (Christine's new husband) to Howard in April 2005. He also testified that Howard had previously owned this property, but had conveyed it to Christine in 1999.

Deputy Renner was the next witness to testify. (Since 2005, he had been reassigned from a narcotics detective to a patrol deputy.) He explained how, on December 14, 2005, he had posed as the owner of Brewer's Wrecker Service that was purportedly in possession of the Passat that Bautista-Benitez had driven. Deputy Renner

told the jury that he had arranged for Cornwell to come to Cleveland, Tennessee for the purpose of picking up the Passat, and that he was involved in the takedown operation at Brewer's on that date.

After Deputy Renner testified, former Lieutenant Quinn took the stand. (He had retired from the police force prior to the time of trial.) Lieutenant Quinn said that he had been "the detective lieutenant over the narcotics division for the sheriff's office in Bradley County" at the time of Howard's arrest and investigation. He explained that he had supervised the undercover operation at Brewer's and had witnessed the search of the Suburban and the discovery of the cash inside.

The government then called Cornwell to testify. Cornwell said that she had agreed to help her stepfather retrieve his car from the wrecker service in Cleveland, Tennessee at his request. She also testified that she had seen Howard meet with a Hispanic man named Tony (whom she later identified as Bautista-Benitez) on a number of occasions, and that Howard had informed her that Tony wrecked Howard's car. Cornwell further acknowledged that she was aware that Howard and Tony were engaged in illegal drug activity.

The next witness was Agent Rolfson. Agent Rolfson testified that he was familiar with the Carlisle Road property and had "had contact with Mr. Howard in the past" there. He also told the jury about the digital scales and the electronic money counter discovered in the second mobile home on the property. In addition, Agent Rolfson explained that digital scales and a money counter were the type of equipment commonly used by drug traffickers.

The government then called Agent David Shelton, a special agent with the DEA, to the stand. Agent Shelton explained the typical characteristics of drug trafficking in the United States. He said, for instance, that Atlanta was a "source city" for drugs, and noted that Interstate 75 was a major transportation route for drugs going northbound and drug money going southbound. Agent Shelton also testified that $95,000 was an average price for five kilograms of cocaine. He further stated that five kilograms of cocaine went

"well beyond" a personal-use quantity, and was more consistent with an intent to distribute the drug.

After Agent Shelton testified, the government raised an issue outside the presence of the jury. Specifically, the government contended that Howard had challenged the government's proof that he lived on the Carlisle Road property, and therefore had placed the issue in controversy. The government thus sought permission to introduce evidence about a 2003 encounter with Howard on the property. On that date, Agents Rolfson and Hardcorn had gone to 15712 Carlisle Road to execute a search warrant. Howard was discovered on the property, but initially denied living there. After a key to the gate was found on Howard's person, however, he conceded that he resided on the property. He later pled guilty to charges relating to a methamphetamine lab found on the premises.

Howard objected to this proffered evidence. The district court sustained Howard's objection regarding any reference to Howard's methamphetamine conviction, but heard further argument concerning the agents' prior encounter with Howard on the property. Howard first argued that this evidence was irrelevant because it demonstrated only that Howard had resided at 15712 Carlisle Road in 2003. But Howard contended that this fact was not in dispute. The disputed fact, according to Howard, was whether he had any connection to the second mobile home, which was located on the 15690 Carlisle Road parcel. Howard next claimed that such evidence would be unfairly prejudicial because the jury would draw negative inferences from testimony that he had had prior dealings with drug strike-force agents.

The district court disagreed with Howard. It concluded that the evidence met the low threshold for relevance established by Rule 401 of the Federal Rules of Evidence. The court also determined that the danger of unfair prejudice was low and, in any event, did not substantially outweigh the probative value of the evidence.

Howard then reiterated his arguments, and the district court remarked that one way the parties could resolve this issue was to stipulate to Howard's residence on Carlisle Road. The court told the parties that they could discuss the matter between

themselves and offer a stipulation if they agreed. Howard's counsel voiced an interest in such a stipulation, but the parties never presented any stipulation to the court.

The government then recalled Agent Rolfson, who testified that he had previously encountered Howard on the Carlisle Road property in April 2003. He further explained that "agents from the drug strike force and other agents responded [to the property] in reference to an investigation." Howard's counsel objected to this testimony and, once the jury was out of the courtroom, moved for a mistrial. The district court denied the motion, but cautioned Agent Rolfson to limit his answers to the scope of the questions asked.

Agent Rolfson then testified that, when the agents first encountered Howard, he denied living on the Carlisle Road property. But once keys to the property were found on Howard's person, Agent Rolfson recounted, Howard had admitted that he lived there. Agent Rolfson conceded on cross-examination, however, that the second mobile home was not on the property in April 2003, and that the gate was unlocked when they searched the property in December 2005.

The government rested its case after Agent Rolfson testified. Immediately thereafter, Howard moved for a judgment of acquittal. The district court denied the motion.

Howard then presented his defense. He first called Blair Schrader, the Fiscal Court Clerk for Boone County, Kentucky, as a witness. Schrader testified concerning a matter unrelated to the present appeal.

Howard then recalled Deputy McKee as a witness, apparently to attack the credibility of Bautista-Benitez's trial testimony. Deputy McKee testified that, when he pulled over the Passat on December 12, 2005, Bautista-Benitez changed his story several times about why he was traveling to Kentucky and also lied about there being no drugs in the car. In addition, when Deputy McKee took a statement from Bautista-Benitez in jail on December 15, 2005, Bautista-Benitez claimed to have been up to the greater Cincinnati–northern Kentucky area approximately fifteen times, instead of the two to

three times that he testified to at trial. Deputy McKee also said that Bautista-Benitez did not mention Martine Lopez or any trips to Atlanta in his statement. Howard rested his case after this testimony.

In rebuttal, the government briefly recalled Cornwell to testify about matters unrelated to this appeal. The jury later returned a verdict of guilty on both counts of the superseding indictment.

After trial, Howard filed motions for a new trial and for a judgment of acquittal based on various arguments that he had made before and during trial. The court denied both of these motions. This appeal followed.

## II. ANALYSIS

### A.      Drug-dog expert

#### 1.      *Relevant legal standard*

The first issue raised in this appeal is whether the district court abused its discretion when it refused to authorize funds for Howard (who is indigent) to obtain a drug-dog expert. Under the Criminal Justice Act,

> [c]ounsel for a person who is financially unable to obtain investigative, expert, or other services necessary for adequate representation may request them in an ex parte application. Upon finding, after appropriate inquiry in an ex parte proceeding, that the services are necessary and that the person is financially unable to obtain them, the court, or the United States magistrate judge if the services are required in connection with a matter over which he has jurisdiction, shall authorize counsel to obtain the services.

18 U.S.C. § 3006A(e)(1). On appeal, we review a district court's decision about whether to authorize such services under the abuse-of-discretion standard. *United States v. Gilmore*, 282 F.3d 398, 406 (6th Cir. 2002).

An indigent criminal defendant may not use § 3006A(e)(1) to fund a speculative "fishing expedition." *See United States v. Clark*, 385 F.3d 609, 618 (6th Cir. 2004) (citation omitted) (affirming the district court's decision to deny a request for a

psychological expert where the need for such expert was based entirely on speculation). Rather, "[a]n indigent defendant may obtain authorization for investigative, expert, or other services under 18 U.S.C. § 3006A(e)(1) upon a demonstration that (1) such services are necessary to mount a plausible defense, and (2) without such authorization, the defendant's case would be prejudiced." *Gilmore*, 282 F.3d at 406. Under this standard, "[a] district court need not grant an indigent's motion under § 3006A on the off chance that the requested services might turn up something." *Id.*

### 2. *Whether the district court abused its discretion*

Howard sought the assistance of a drug-dog expert to support his multiple motions to suppress the evidence obtained during the searches of his Suburban and the second mobile home. Because the district court denied his request, Howard contends that he was unable to adequately attack the reliability of the drug dog Titan. Had he had expert assistance, Howard argues, he could have demonstrated that Titan's alert on his Suburban was unreliable and therefore insufficient to establish probable cause to search the vehicle.

In *United States v. Diaz*, 25 F.3d 392 (6th Cir. 1994), this court held that "[a] positive indication by a properly-trained dog is sufficient to establish probable cause for the presence of a controlled substance." *Id.* at 393-94. The court further explained that, "[f]or a positive dog reaction to support a determination of probable cause, the training and reliability of the dog must be established." *Id.* at 394. A dog's training and reliability is established for purposes of admitting the dog's alert where "the evidence presented, whether testimony from the dog's trainer or records of the dog's training, establishes that the dog is generally certified as a drug detection dog." *Id.* Beyond that, "any other evidence, including the testimony of other experts, that may detract from the reliability of the dog's performance properly goes to the 'credibility' of the dog"—that is, the *weight* to be given the dog's alert. *Id.*

There is no clear line between the quantum of proof required to establish the admissibility of a drug-dog alert and that required to prove probable cause based on the alert. But, at least where there are no unusual circumstances that call into question the

credibility of the dog's handler, this court has held that the testimony of the dog's handler alone is sufficient to "support[] a finding that [the drug dog] was trained and reliable." *Id.* at 395. The question thus becomes when is a drug-dog expert necessary to rebut such testimony.

As the district court observed, "a great number of criminal cases . . . are initiated by or involve drug detection dog alerts." *United States v. Howard*, 448 F. Supp. 2d 889, 891 (E.D. Tenn. 2006). If the court were required to approve a request for a drug-dog expert "in every case involving an alert by a drug-detection dog," then "[s]uch a requirement would be unduly burdensome given the frequency with which dog alerts are used as a basis for probable cause." *Id.* We agree that the mere fact that a drug-dog alert was used as a basis for probable cause does not alone trigger a criminal defendant's right to be assisted by a drug-dog expert. Instead, as explained below, the defendant must set forth specific facts demonstrating that a legitimate controversy exists concerning either the olfactory capabilities of the alerting dog, the dog's certification, the dog's training, or the circumstances surrounding the dog's alert.

But before we commence our analysis, we must note the procedural context in which we consider this issue. Howard's challenge to Titan's alert is part of his appeal of the district court's denial of his motions to suppress the evidence discovered in his Suburban and in the second mobile home. The government never sought to introduce Titan's alert as evidence at Howard's trial before the jury. We are thus not asked to determine, and express no opinion on, the appropriate standard for expert assistance where the government intends to admit a drug dog's alert as evidence at trial.

Having made this caveat, we now turn to the merits of Howard's argument. In doing so, we acknowledge that we are venturing into relatively uncharted waters because the caselaw concerning the need for expert assistance on drug-dog alerts is sparse. The record made by the parties below, however, offers us some assistance in this regard. As the district court properly observed, the science supporting the ability of dogs to detect the odor of narcotics is uncontroverted. *Id.* at 896-97. Expert assistance is therefore not necessary to understand or analyze the olfactory capabilities of dogs generally. *Id.* at

897.  But we discern at least four other aspects of a drug-dog's alert that could present circumstances where expert assistance is "necessary to mount a plausible defense," as explained below.

### a.     *Physical health*

First, something about the alerting dog's health or anatomy could give rise to the need for an expert.  This is not to suggest that an indigent defendant may gain expert assistance merely by speculating about a dog's health problems.  *See United States v. Clark*, 385 F.3d 609, 618 (6th Cir. 2004) (reasoning that a criminal defendant who wishes to launch nothing more than a "fishing expedition" has not demonstrated the necessity for expert assistance).  But if the record contains evidence reasonably suggesting that the alerting dog has some sort of ailment or impairment, an expert may be necessary to examine the dog and analyze the problem.

In the present case, however, Howard never contended that Titan was unhealthy or that Titan's olfactory capabilities were in any way substandard.  *See Howard*, 448 F. Supp. 2d at 897.  He therefore failed to demonstrate that he needed expert assistance to challenge Titan's physical health.

### b.     *Certification*

A second situation where a drug-dog expert might be necessary is where something about the alerting dog's certification is suspect.  In such an instance, the expert's knowledge of national drug-dog certification standards, the qualifications of a particular certification organization, or the certification process of the drug dog in question would be helpful to rebut that dog's reliability.

But Howard made no showing that an expert would be necessary to challenge Titan's certification in the present case.  The district court concluded that Howard's proposed expert would not have been of assistance in this area because "[t]here is nothing in [the proposed expert's] submitted background to suggest he has any expertise in opining on the qualifications of drug detection dog certification associations or any particular knowledge of this particular credentialing organization."  *Id.* at 896.  Howard

has not challenged this finding on appeal, and we agree with the district court's reasoning on this point.

### c.        *Training and performance*

An expert might also be necessary where there are facts in the record demonstrating that the alerting dog's training was inadequate or that the dog's performance had been inconsistent. We note, however, that such evidence must concern the alerting dog at issue. This court has viewed expert testimony offered to disprove the reliability of drug dogs *generally* as having little value when determining the reliability of a *particular* drug dog. *See United States v. Diaz*, 25 F.3d 392, 395 (6th Cir. 1994) (approving the district court's reasoning that "the limited information" upon which the opinion of the defendant's drug-dog expert was based "most assuredly detracts from his testimony," where the expert had neither observed the alerting dog in action nor spoken with the dog's trainer or handler); *see also United States v. Torres-Ramos*, 536 F.3d 542, 554 (6th Cir. 2008) (concluding that the testimony of a drug-dog handler established the dog's reliability even where a defense expert testified that Ohio's drug-dog certification process was inherently flawed and the dog should have been more accurately trained to ignore residual odors). Thus, in the normal case, the testimony of a drug-dog expert who has not observed the alerting dog in question—and that dog's interactions with its handler—is not particularly helpful to dispute the dog's reliability. And such testimony certainly is not *necessary* for that purpose.

Rather, as recognized by the district court, "the primary issue in determining the credibility of a dog's alert is not the capability or ability of a dog to accurately identify particular scents, but is instead the communication between the handler and the dog based on that indisputable ability." *Howard*, 448 F. Supp. 2d at 897-98. This determination in turn rests almost entirely on the credibility of the dog handler's testimony "[b]ecause the handler is the only witness who can speak to the subjective interaction during a particular dog alert." *Id.* at 900.

Howard argues that he needed a drug-dog expert in this case to challenge Titan's training records because traditional methods of confronting this evidence, such as cross-

examination and offering contrary evidence, were insufficient due to the fact that Detective Choate, Titan's handler, was not a disinterested witness. But this goes to the credibility of Detective Choate, which is not a subject on which a drug-dog expert has any particular expertise. Moreover, Howard's counsel effectively cross-examined Detective Choate on Titan's training records, causing Detective Choate to admit that, where the records indicated that Titan trained ten hours per month, this time included transport and preparation, so the amount of reported time that Titan was being actively trained was in fact less than ten hours per month. Howard argues that "the significance of these facts [could] only be explained by an expert." But as the district court correctly observed, "[s]hould counsel believe he needs to develop an accurate explanation of Titan's training records, he has the ability to call as a witness those who prepared and produced those records." *Id.*

The district court ultimately concluded that Howard had failed to demonstrate how a drug-dog expert would be helpful in assessing the credibility of Titan's handler, Detective Choate. *See id.* at 900-01. We agree. And because Howard has not otherwise shown that Titan's training and performance records contained irregularities that required expert analysis, Howard failed to establish that he needed expert assistance in order to challenge Titan's training or performance.

### d. Alert

Finally, an indigent defendant might be able to demonstrate that he or she needs the assistance of an expert if the drug-dog alert at issue was ambiguous or the product of abnormal circumstances. But there are no facts in the record before us to suggest anything unusual about Titan's alert on Howard's Suburban. And Howard has not argued that Titan's alert was ambiguous or suspicious. In fact, Howard's counsel admitted during oral argument that Titan's alert on the Suburban was accurate. The circumstances of Titan's alert therefore do not support Howard's purported need for expert assistance in this case.

### 3.      *Conclusion*

In sum, Howard has made no showing to suggest that Titan's physical health, certification, training, or alert on the Suburban presented peculiar facts that necessitated the assistance of a drug-dog expert.  As a result, he has failed to demonstrate that such an expert was "necessary to mount a plausible defense" for purposes of the district court's probable-cause determination.  *See United States v. Gilmore*, 282 F.3d 398, 406 (6th Cir. 2002).  The district court accordingly did not abuse its discretion when it denied Howard's motion.  *See United States v. Booker*, 186 F.3d 1004, 1007 (8th Cir. 1999) (affirming the district court's decision not to authorize funding for a drug-dog expert to assist the defendant with suppression issues where the district court "did not feel the need for expert help with respect to the appropriate inferences to be drawn from the" alerting dog's behavior).

## B.     Suppression issues

The second issue raised in this appeal concerns the district court's denial of Howard's motions to suppress evidence.  In particular, Howard argues that the court should not have allowed the jury to hear any evidence regarding the $95,000 in cash discovered in his Suburban, or regarding the digital scales and the electronic money counter found in the second mobile home.  He contends that this evidence was obtained (1) as the result of Howard's unlawful arrest, and (2) through searches that were not supported by probable cause.

### 1.      *Standard of review*

A motion to suppress evidence presents a mixed question of law and fact.  *United States v. Torres-Ramos*, 536 F.3d 542, 549 (6th Cir. 2008).  When reviewing a trial court's decision on such a motion, we examine the district court's legal conclusions de novo.  *Id.*  Factual findings, on the other hand, are reviewed under the clear-error standard.  *Id.*  Specifically,

> [a] factual finding will . . . be clearly erroneous when, although there may
> be evidence to support it, the reviewing court on the entire evidence is

left with the definite and firm conviction that a mistake has been committed. This court accords deference to the district court's assessment of credibility inasmuch as the court was in the best position to make such a determination. The evidence must be considered in the light most favorable to the party that prevailed in the court below—in this case, the government.

*United States v. Smith*, 594 F.3d 530, 535 (6th Cir. 2010) (citations and internal quotation marks omitted).

### 2.     *Exclusionary rule*

Howard based his motions to suppress on the exclusionary rule, which is derived from the Fourth Amendment to the U.S. Constitution. As the Supreme Court has explained,

> [t]he exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search, and of testimony concerning knowledge acquired during an unlawful search. Beyond that, the exclusionary rule also prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes so attentuated as to dissipate the taint.

*Murray v. United States*, 487 U.S. 533, 536-37 (1988) (citations and internal quotation marks omitted). This rule is triggered where evidence is obtained following an unlawful arrest. *See United States v. Richardson*, 949 F.2d 851, 859 (6th Cir. 1991) (holding "that the taint of the illegal arrest vitiated [the defendant's] consent and that the immediate fruits of the consent should have been suppressed").

But there are exceptions to the exclusionary rule, two of which are addressed by the parties in the present case. The first is referred to as the independent-source doctrine. *See Murray*, 487 U.S. at 537. This doctrine rests on the proper balance to be struck between the "'interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime.'" *Id.* (quoting *Nix v. Williams*, 467 U.S. 431, 443 (1984)). The exclusionary rule should "'put[] the police in the same, not a *worse*, position tha[n] they would have been in if no police error or

misconduct had occurred.'" *Id.* (emphasis in original) (quoting *Nix*, 467 U.S. at 443). Accordingly, where "'challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.'" *Id.* (quoting *Nix*, 467 U.S. at 443). This doctrine applies to both evidence "obtained for the first time during an independent lawful search" and "evidence initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from activities untainted by the initial illegality." *Id.*

The second pertinent exception to the exclusionary rule is known as the inevitable-discovery doctrine, and it is "an extrapolation from the independent source doctrine." *Id.* at 539. As the Supreme Court has described the doctrine, "*[s]ince* the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered." *Id.* (emphasis in original). In other words, "if the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police, there is no rational basis to keep that evidence from the jury in order to ensure the fairness of the trial proceedings." *Nix*, 467 U.S. at 447.

The district court in the present case determined that Howard was arrested without probable cause on December 14, 2005 at Brewer's Wrecker Service. Howard's purported consent to search the Suburban was thus tainted by his unlawful arrest. *See Richardson*, 949 F.2d at 858-59. Any incriminating evidence discovered in the Suburban should therefore have been suppressed, unless one of the exceptions to the exclusionary rule applies. *See Murray*, 487 U.S. at 536-37.

The government argues that the independent-source doctrine validates the search of Howard's Suburban due to Titan's alert on the vehicle. Specifically, it contends that the officers had a reasonable suspicion to justify Titan's deployment under *Terry v. Ohio*, 392 U.S. 1 (1968). And even if Titan's alert cannot be causally severed from Howard's unlawful arrest, the government asserts that the evidence found in the

Suburban and later at the second mobile home inevitably would have been discovered by legal means. Howard disputes this reasoning.

The district court concluded that, at the time of Howard's unlawful arrest, the officers "had a reasonable and articulable suspicion" that Howard was involved in illegal drug activity along with Bautista-Benitez and Cornwell. Howard never challenged this finding, and therefore his reliance on *United States v. Buchanon*, 72 F.3d 1217 (6th Cir. 1995), to argue that Titan's alert cannot independently justify the search of his Suburban, is misplaced. In *Buchanon*, this court held that, where there *was no reasonable suspicion* to detain the criminal defendant in the first instance, a drug-dog sniff constitutes an invalid "exploitation of a primary illegality." *Id.* at 1226. The present case, however, is distinguishable from *Buchanon* because the officers here had reasonable suspicion to detain Howard when he showed up to retrieve the drug-laden Passat.

As set forth above, "[t]he officers reasonably suspected the Suburban's occupants of illegal drug trafficking, and the canine narcotics sniff [wa]s directly related to investigating this suspicion." *See United States v. Garcia*, 496 F.3d 495, 504 (6th Cir. 2007). Accordingly, the officers were permitted by the principles of *Terry* "briefly to detain [Howard and his Suburban] for investigative purposes." *See United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005).

The officers' detention of Howard and his Suburban for the purposes of the drug-dog sniff was brief. There was, at most, a ten-minute wait for Detective Choate to retrieve Titan, and Titan alerted on Howard's Suburban within a few minutes after arriving. The length of this detention was therefore reasonable. *See Garcia*, 496 F.3d at 504 (holding that "the duration of the stop was reasonable [because] the canine sniff was performed within a half hour of the stop, and we have previously upheld an investigatory stop that included a thirty-five minute wait for the canine unit"); *Davis*, 430 F.3d at 354 (concluding that "the police had reasonable suspicion to detain [the defendant] for the additional approximately thirty to forty-five minutes it took for the

police to bring the first drug-sniffing dog to the scene and have the dog check the vehicle for the presence of narcotics").

Howard responds by contending that, because he was personally seized in a forceful manner indicative of an arrest, the officers' conduct during his detention exceeded the scope of a valid *Terry* investigation. But this argument misses the point. The question is not whether the officers' conduct amounted to an arrest of Howard; the district court in fact resolved this issue in Howard's favor. Rather, the question is whether Titan's alert *was the result of* the unlawful arrest. *See United States v. Bentley*, 29 F.3d 1073, 1075-76 (6th Cir. 1994) (concluding that, even though the defendant was arrested prematurely, the police had reasonable suspicion to detain him, and evidence observed in plain view constituted an independent basis to justify the subsequent search of the defendant's vehicle).

In this regard, the present case is strikingly similar to *Garcia*, where this court reasoned:

> [The defendant] contends that his arrest during the stop of the Suburban is the prior illegality that tainted the subsequent search warrant for the Suburban. According to [the defendant's] argument, because the illegal arrest allowed the officers to execute a canine narcotics sniff and because the results of the canine sniff were included in the supporting affidavit, the search warrant is a fruit of his illegal arrest and is thus invalid. [The defendant's] argument erroneously equates the investigatory stop of the Suburban with his allegedly illegal arrest. Even assuming he was illegally arrested at the time the Suburban was stopped, it was the investigatory stop—and not the illegal arrest—that produced the canine narcotics sniff and the resulting search warrant. So long as the officers acted properly in stopping the vehicle and executing the canine sniff, the resulting search warrant was not tainted by a prior illegality.

*Garcia*, 496 F.3d at 503. Tellingly, Howard did not even attempt to distinguish *Garcia* in his brief.

The manner in which Howard was detained did rise to the level of an arrest, but the officers' display of authority and use of force to detain him did not create the circumstances that led to Titan sniffing the Suburban. Instead, Lieutenant Quinn, who

had neither participated in the arrest of Howard nor spoken to Howard after the arrest, instructed Detective Choate to bring Titan to the scene to perform a sniff of the Suburban before the officers searched the vehicle. Detective Choate complied with Lieutenant Quinn's command, which made Titan's deployment entirely independent of Howard's arrest.

### 3. *Probable cause for the search of the Suburban*

We now turn to the question of whether Titan's alert established probable cause to search Howard's Suburban. This court has defined probable cause as "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion, and is said to exist when there is a fair probability, given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place." *United States v. Lattner*, 385 F.3d 947, 951 (6th Cir. 2004) (citation and internal quotation marks omitted). As explained above, the alert of a properly trained and reliable drug dog "is sufficient to establish probable cause for the presence of a controlled substance." *United States v. Diaz*, 25 F.3d 392, 393-94 (6th Cir. 1994).

Titan's handler, Detective Choate, testified at two suppression hearings (in March 2006 and January 2007) concerning Titan's certification, training, and reliability. Significantly, Howard did not object to the magistrate judge's determination after the first suppression hearing that Detective Choate's testimony was credible.

At the first hearing, Detective Choate said that he began working in the drug enforcement unit of the Bradley County Sheriff's Office in October 2004. He acquired Titan, a German Shepherd, in January 2005, and went with Titan to training school shortly thereafter in Franklin, Tennessee. This training lasted three and a half to four weeks, concluding in early March 2005. Both Detective Choate and Titan were then certified by the National Narcotic Detector Dog Association (NNDDA). Detective Choate said that most of the canine units that he has encountered certify with this organization. Certification lasts for one year, and the dog and handler have to be recertified once every twelve months in order to maintain that status. Detective Choate and Titan had already been recertified for 2006.

In accordance with the policy of the Bradley County Sheriff's Office, Detective Choate testified that he and Titan participate in ten recorded hours of training every month. Detective Choate acknowledged on cross-examination, however, that this time includes preparation of the training location and transportation to and from the site. But he also explained that he works with his dog on a daily basis and does not record all of such time because he is limited to ten hours of training per month pursuant to the Sheriff's policy that limits the extra pay that he receives for such training. In addition, Titan has been deployed "numerous" times in the field and has always performed accurately.

The district court concluded that Detective Choate's testimony demonstrated that Titan's alert was sufficiently reliable. Specifically, the court reasoned:

> Detective Choate offered credible testimony his dog was both certified and reliable. Detective Choate testified Titan was certified by the National Narcotic Detector Dog Association. The Government submitted copies of the certificates and the detective indicated Titan had recently been recertified. Titan also had continuing training in compliance with departmental policy. Choate testified, to his knowledge, Titan had not yet alerted on a false positive (Titan had never alerted when no drugs were present). Defendant offered no evidence and could offer no evidence contrary to this. Defendant was never in a position to refute or challenge this testimony. Even the expert Defendant wished to hire could offer no testimony to refute Detective Choate's.

> Additionally, Defendant's fixation on certification is misplaced. Certification, much like a college or legal degree is, in the end, simply a statement by an institution that an individual has satisfactorily completed a particular course of study. The officer's testimony as well as the records show Titan had been deployed numerous times, and when Titan alerted on an object or location it was uniformly when drugs had been present. That alone, if credited, is sufficient to show Titan was reliable, and the alert was sufficient to create probable cause to search Defendant's Suburban. The magistrate judge credited Choate's testimony and explanation of the records; this Court, on the record, sees no reason to disagree with that determination.

> When considering whether probable cause exists a court looks at the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983). So the question is not so narrow as whether Titan's 'hit' constituted probable cause, rather, the question is whether Titan's 'hit'

along with all the other facts known to the officers at the time constituted probable cause. Along with Titan's 'hit' the officers knew Cornwell claimed to be the girlfriend of Benitez, who possessed five kilograms of cocaine in a hidden compartment of his car. After Renner told her Benitez had been in an accident, his "girlfriend" drove down in two days without asking about Benitez's health or location after at least 13 conversations with Renner. After this, Titan alerted on the vehicle. The dog sniff provided the best reason to believe contraband might be found in the Suburban, but combined with a dubious story by individuals connected to a car which contained five kilograms of cocaine a man of reasonable prudence would be warranted "in the belief that contraband or evidence of a crime" would be found in the Suburban. *Ornelas v. United States*, 517 U.S. 690, 696 (1996).

(Footnote and record citation omitted.) We adopt this sound reasoning and conclude that Titan's alert established probable cause to search Howard's Suburban.

Because the search of the Suburban was supported by probable cause, independent of Howard's unlawful arrest, the cash contained inside of the vehicle was properly seized. *See Arizona v. Gant*, 129 S. Ct. 1710, 1721 (2009) (explaining that an automobile search is sustainable "[i]f there is probable cause to believe a vehicle contains evidence of criminal activity"). The district court thus did not err in denying Howard's motion to suppress the cash found in Howard's Suburban.

### *4.     Probable cause for the search of the Carlisle Road property*

In addition to arguing that evidence of the cash discovered in the Suburban should have been suppressed, Howard contends that the district court should have disallowed any mention of the digital scales and the electronic money counter found in the second mobile home on the Carlisle Road property. He claims that Agent Hardcorn's search-warrant affidavit was fatally flawed because it referenced the seizure of the $95,000 in cash from the Suburban—the purported "poisonous fruit" of his unlawful arrest. But, as explained in Part II.B.3. above, this argument is without merit.

Howard also asserts that, even if the cash seizure was properly included in the search-warrant affidavit (which it was), the affidavit fails to establish probable cause. To establish probable cause, this court has explained that "the circumstances must

indicate why evidence of illegal activity will be found in a particular place. There must, in other words, be a nexus between the place to be searched and the evidence sought." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc) (citation and internal quotation marks omitted).

Agent Hardcorn's affidavit set forth the following facts: (1) Tennessee law enforcement agents had discovered five kilograms of cocaine in the hidden compartment of a car driven by Antonio Bautista-Benitez, (2) the agents then made several controlled calls to a number listed at 15712 Carlisle Road, during which they spoke with persons who wished to pick up the car that Bautista-Benitez had been driving, (3) Cornwell and Howard drove to Tennessee to pick up Bautista-Benitez's car in a vehicle that was registered to Howard at 15712 Carlisle Road, (4) the agents discovered $95,000 in cash in Howard's vehicle, (5) Cornwell advised law enforcement that Bautista-Benitez stayed at Howard's residence about once a month for the past year and a half, and (6) Howard had several prior drug arrests, as well as a conviction for manufacturing methamphetamine at 15712 Carlisle Road. These facts are more than sufficient to establish probable cause that criminal activity was taking place at the Carlisle Road property. Howard's argument to the contrary is largely perfunctory and, in any event, meritless.

### 5.    *Description of the Carlisle Road property in the search warrant*

As still another ground to suppress the evidence discovered in the second mobile home, Howard argues that the search warrant for the Carlisle Road property failed to sufficiently describe the property as required by the Fourth Amendment. This court has established a two-factor test for "determining whether a warrant describes with sufficient particularity the place to be searched." *Knott v. Sullivan*, 418 F.3d 561, 568 (6th Cir. 2005). The court considers

> (1) whether the place to be searched is described with sufficient particularity as to enable the executing officers to locate and identify the premises with reasonable effort; and (2) whether there is reasonable probability that some other premises may be mistakenly searched.

*Id.* (citation omitted). Minor, technical inaccuracies in the description will not render the search warrant unconstitutional. *Id.* at 568-69.

The warrant in the present case contained one such minor, technical inaccuracy. It described Howard's property as a single parcel with an address of 15712 Carlisle Road, when in fact the property is made up of two parcels: 15712 Carlisle Road *and* 15690 Carlisle Road. The digital scales and the electronic money counter were found in the second mobile home that was actually located at the 15690 Carlisle Road address.

Nevertheless, the second mobile home was described in the search warrant as part of the property that was to be searched. It was admittedly described as being "located on the property of 15712 Carlisle Road," which was technically inaccurate. But this minor misstatement does not render the warrant invalid, particularly due to the fact that the Carlisle Road property was otherwise described with reasonable accuracy. *See United States v. Pelayo-Landero*, 285 F.3d 491, 496-97 (6th Cir. 2002) (holding that the warrant that listed an incorrect address but otherwise accurately described the property was valid); *United States v. Durk*, 149 F.3d 464, 465-66 (6th Cir. 1998) (same). Because the second mobile home was listed in the search warrant as a building subject to search, and because both mobile homes were accessed by a common driveway from Carlisle Road and shared a single mailbox that bore the 15712 address, the district court properly declined to suppress the evidence discovered inside the second mobile home.

## C.       Cross-examination of Bautista-Benitez

We now turn to Howard's arguments concerning errors that purportedly occurred during his trial. His first such claim is that the district court erroneously limited his counsel's cross-examination of Bautista-Benitez, in violation of the Sixth Amendment's Confrontation Clause.

A criminal defendant has the constitutional right "to confront the witnesses against him," but "this right is not absolute." *United States v. Davis*, 430 F.3d 345, 360 (6th Cir. 2005). The Supreme Court has explained that "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such

cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdell*, 475 U.S. 673, 679 (1986). We review a district court's decision to limit the scope of cross-examination under the abuse-of-discretion standard. *United States v. Kone*, 307 F.3d 430, 436 (6th Cir. 2002).

Howard's counsel attempted to cross-examine Bautista-Benitez about a motion to suppress that Bautista-Benitez had filed prior to entering a plea of guilty with regard to the transportation of the cocaine discovered in the Passat. Specifically, he asked: "Mr. Bautista, did you file a motion to try to exclude the evidence in your case?" The government objected to this question on relevance grounds. Howard's counsel responded that he was trying to attack Bautista-Benitez's credibility by showing that Bautista-Benitez had sought to avoid responsibility for his actions before he eventually pled guilty. The district court sustained the government's objection, ruling that Howard's intended use of the testimony improperly punished Bautista-Benitez for exercising his constitutional right to challenge the legality of the evidence against him. Howard argues on appeal that this reasoning is "misplaced."

The government asserts in its brief that "[i]t would be generous to characterize evidence about whether a witness's attorney filed a motion in the witness's case as even marginally relevant to the witness's credibility. It would certainly have been confusing to the jury." We agree. Howard's question was far more likely to confuse the issues than to constitute an identifiable attack on Bautista-Benitez's credibility. *See* Fed. R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of . . . confusion of the issues . . . ."). Moreover, Howard's counsel had already shown that Bautista-Benitez did not initially accept responsibility for his actions by eliciting testimony from him that he lied to the police about having drugs in the Passat when he was first stopped on Interstate 75. The district court therefore did not abuse its discretion when it sustained the government's objection to the question put to Bautista-Benitez, even though the reason given in support of the court's ruling was indeed "misplaced." *See Dixon v. Clem*, 492 F.3d 665, 673 (6th Cir.

2007) (explaining that this court "may affirm on any grounds supported by the record even if different from the reasons of the district court" (citation omitted)).

**D.     Testimony of Agent Rolfson**

Howard next argues that the district court abused its discretion by permitting the government to question Agent Rolfson about his 2003 encounter with Howard on the Carlisle Road property.  According to Howard, this testimony should have been excluded under Rule 403 of the Federal Rules of Evidence.

Rule 403 provides in part that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice."  This court has explained that "[u]nfair prejudice does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest [a] decision on an improper basis." *United States v. Bonds*, 12 F.3d 540, 567 (6th Cir. 1993) (citation and internal quotation marks omitted). In reviewing a district court's decision to exclude evidence under Rule 403, we "view[] the excluded evidence in the light most favorable to the proponent." *Kovacevich v. Kent State Univ.*, 224 F.3d 806, 831-32 (6th Cir. 2000).  Balancing under Rule 403 is "highly discretionary" and, therefore, "the district court's decision is afforded great deference." *United States v. Bell*, 516 F.3d 432, 445 (6th Cir. 2008).  Thus, "a decision will not be disturbed if substantial injustice did not result." *Kovacevich*, 224 F.3d at 832.

Prior to eliciting testimony on the matter, the government asked the district court for permission to introduce evidence of Agent Rolfson's 2003 encounter with Howard. This encounter was part of a drug strike-force investigation that culminated in Howard's conviction for the manufacture of methamphetamine.  The government reasoned that Howard had put his connection to the Carlisle Road property into question.  It therefore wanted to recall Agent Rolfson as a witness so that he could testify that he had previously been on the property during a drug strike-force investigation and had encountered Howard, who at first denied living there.  Agent Rolfson was also prepared to testify that Howard eventually admitted that he lived there when the officers found a key to the property on his person.  The government argued that a jury could infer from

this evidence that Howard was still living at the Carlisle Road property when it was searched in December 2005.

On the other hand, as Howard pointed out, a jury might draw improper inferences from this proffered testimony about Howard's propensity to commit crime. The district court acknowledged Howard's point when it suggested that the parties could obviate the need for this testimony and avoid the problem entirely by stipulating to Howard's residence on the Carlisle Road property. But the parties never offered any such stipulation (even though there was a break in the court proceedings for lunch before Agent Rolfson was recalled to testify).

The district court allowed the government to recall Agent Rolfson on this matter. Specifically, the court determined that Agent Rolfson could testify that he and other agents had previously been to the Carlisle Road property and had encountered Howard there. The court reasoned that such testimony would not be unfairly prejudicial because "the jury has already been told by, I believe, more than one officer that there was some familiarity with this defendant and the property." We agree with this analysis.

In addition, the district court ruled that the government could introduce evidence that Howard had a key to the property on his person in 2003. Such evidence, the court said, "would tend to counter" the "suggestion that this defendant had no responsibility for the property." And the fact that the property was legally comprised of two separate parcels did not detract from the relevance of this testimony because the entire property was locked by a single gate, and the key to this gate was discovered on Howard's person.

We agree that Agent Rolfson's testimony tended to demonstrate Howard's connection to the Carlisle property as a whole, and thus was relevant to the issue of whether Howard had possession of the incriminating items found in the second mobile home. Accordingly, we conclude that the district court did not abuse its discretion in allowing the government to recall Agent Rolfson to testify about his 2003 encounter with Howard.

**E.      Motion for mistrial**

When Agent Rolfson was recalled as a witness, he testified that he and other agents from the drug strike force came to Howard's residence in April 2003 "in reference to an investigation." Howard immediately objected and moved for a mistrial. He argued that he did not "think the jury can draw anything but a negative inference from" Agent Rolfson's testimony that the drug strike force was previously at the Carlisle Road property. The district court denied the motion.

We review a district court's denial of a motion for a mistrial under the abuse-of-discretion standard. *United States v. Wimbley*, 553 F.3d 455, 460 (6th Cir. 2009). Where a defendant argues that the district court should have granted a mistrial due to improper testimony, such as in the present case, we must first consider whether the challenged testimony was in fact improper. *See United States v. Peatross*, No. 07-2410, 2010 WL 1924707, at *13 (6th Cir. May 13, 2010) (unpublished) ("Implied in the determination of whether a court abused its discretion in denying a motion for a mistrial on the basis of improper testimony is, obviously, that the evidence at issue was somehow improper. If the district court did not err in admitting the evidence, then the district court could not have abused its discretion in denying the motion for a mistrial." (citation omitted)).

Next, if we conclude that the testimony was improper, then we must determine whether the challenged testimony "was so clearly improper and prejudicial to the defendants that the harm could not be erased by any instruction which the court might give." *United States v. Smith*, 601 F.3d 530, 538 (6th Cir. 2010). The five factors that we consider in making this determination are as follows:

> (1) whether the remark was unsolicited, (2) whether the government's line of questioning was reasonable, (3) whether the limiting instruction was immediate, clear, and forceful, (4) whether any bad faith was evidenced by the government, and (5) whether the remark was only a small part of the evidence against the defendant.

*Zuern v. Tate*, 336 F.3d 478, 485 (6th Cir. 2003).

In the present case, Howard's argument fails at the threshold inquiry because he is unable to demonstrate that Agent Rolfson's testimony was improper. When the district court allowed the government to recall Agent Rolfson, its ruling was ambiguous as to whether Agent Rolfson was permitted to testify that he had been at the Carlisle Road property in 2003 as part of a drug strike-force investigation. Howard's methamphetamine conviction was clearly excluded, and the fact that Agent Rolfson had encountered Howard on the property was clearly permitted, but the fact of the drug strike-force investigation was not clearly excluded or permitted.

Turning to Agent Rolfson's actual testimony, we conclude that Howard has failed to show that it was unfairly prejudicial. The fact that Agent Rolfson was on the property as part of a drug strike-force investigation was fairly obvious from his prior testimony that he was on the drug strike force and was familiar with Howard and the Carlisle Road property. And the district court had ruled that Agent Rolfson could testify that he encountered Howard on the property in 2003. His allegedly improper statement simply provided background information for this expressly permitted testimony—it explained why Agent Rolfson was there.

Moreover, Agent Rolfson's choice of words minimized whatever unfair prejudice Howard might have suffered as a result of the testimony. Agent Rolfson did not say that the investigation targeted either Howard or the property; he simply said that he came to the address "in reference to an investigation." Significantly, Howard did not move the court to strike this testimony, nor did he request a curative jury instruction. The district court therefore did not abuse its discretion in denying Howard's motion for a mistrial.

**F.     Sufficiency of the Evidence**

Howard's final argument on appeal is that the evidence presented at trial was insufficient to support his conviction. He contends that the district court thus erred in denying his post-trial motion for a judgment of acquittal filed pursuant to Rule 29 of the Federal Rules of Criminal Procedure.

We "review de novo a challenge to the sufficiency of the evidence supporting a criminal conviction." *United States v. Carson*, 560 F.3d 566, 579 (6th Cir. 2009). This requires us to determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). "In undertaking this analysis, this court neither independently weighs the evidence, nor judges the credibility of witnesses who testified at trial." *United States v. Talley*, 164 F.3d 989, 996 (6th Cir. 1999).

Howard argues that the evidence was insufficient to show that he was anything more than an innocent bystander who "was merely the means by which Amy Cornwell used to retrieve the vehicle in which the cocaine was discovered." He further contends that "the government tried to establish Mr. Howard's involvement in the drug conspiracy through the testimony of Ms. Cornwell and Mr. Bautista," but that this testimony contained "glaring inconsistencies."

Howard is essentially attempting to recast a challenge to the credibility of Bautista-Benitez and Cornwell as a sufficiency-of-the-evidence claim. But as this court has explained, "it is well-settled that on appeal, there is no place for arguments regarding a government witness's lack of credibility. Indeed, it is for jurors and not for appellate courts to say that a particular witness spoke the truth or fabricated a cock-and-bull story." *Talley*, 164 F.3d at 996 (brackets, citations, ellipses, and internal quotation marks omitted). We therefore reject Howard's argument. The evidence presented at Howard's trial, as fully detailed in Part I.B.2. above, was more than sufficient to sustain Howard's convictions for conspiring to possess and distribute at least five kilograms of cocaine and for attempting to possess and distribute the drug.

## III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.